Dr. Chester A. WILK, D.C., Dr. James W. Bryden, D.C., Dr. Patricia B. Arthur, D.C., and Dr. Michael D. Pedigo, D.C., Plaintiffs–Appellees, Cross–Appellants,

v.

AMERICAN MEDICAL ASSOCIATION, Defendant–Appellant, Cross–Appellee.

Dr. Chester A. WILK, D.C., Dr. James W. Bryden, D.C., Dr. Patricia B. Arthur, D.C., and Dr. Michael B. Pedigo, D.C., Plaintiffs–Cross–Appellants,

v.

AMERICAN MEDICAL ASSOCIATION, Joint Commission on Accreditation of Hospitals, American College of Physicians and American Academy of Orthopaedic Surgeons, Defendants–Cross–Appellees.

Nos. 87–2672, 87–2777.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1988.

Decided Feb. 7, 1990.

Rehearing and Rehearing En Banc Denied In No. 87–2672 April 25, 1990

beginning.

354

George P. McAndrews (argued), Robert C. Ryan, Robert H. Resis, McAndrews, Held & Malloy, Paul E. Slater (argued), Sperling, Slater & Spitz, Chicago, Ill., for plaintiffs-appellees, cross-appellants.

Jack R. Bierig, Newton N. Minow, David W. Carpenter (argued), Sidley & Austin, Chicago, Ill., for American Medical Ass'n.

Robert E. Nord, D. Kendall Griffith, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Ronald J. Russel, Daniel M. Schuyler (argued), James L. Simon, Schuyler, Roche & Zwirner, Perry L. Fuller, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Phil C. Neal (argued), Neal, Gerber, Eisenberg & Lurie, Chicago, Ill., for other defendants-cross-appellees.

Before WOOD, Jr., RIPPLE, and MANION, Circuit Judges.

MANION, Circuit Judge.

The district court held that the American Medical Association ("AMA") violated § 1 of the Sherman Act, 15 U.S.C. § 1, by conducting an illegal boycott in restraint of trade directed at chiropractors generally, and the four plaintiffs in particular. The court granted an injunction under § 16 of the Clayton Act, 15 U.S.C. § 26, requiring, among other things, wide publication of its order. The court held that two additional defendants, the Joint Commission on Accreditation of Hospitals ("JCAH"), and the American College of Physicians ("ACP"), had acted independently of the AMA's boycott, and dismissed them from the case. *Wilk v. American Medical Association*, 671 F.Supp. 1465 (N.D.Ill.1987). The AMA appeals the finding of liability, and contends that, in any event, injunctive relief is unnecessary. Plaintiffs cross-appeal against JCAH and ACP. We affirm.

I.

We have observed before that "antitrust cases are notoriously extended." *Ball Memorial Hospital Inc. v. Mutual Hospital Insurance Inc.*, 784 F.2d 1325, 1333 (7th Cir.1986). This case is no exception. Plaintiffs Chester A. Wilk, James W. Bryden, Patricia B. Arthur, and Michael D. Pedigo, are licensed chiropractors. Their complaint, originally filed in 1976, charged several defendants with violating §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

It sought both damages and an injunction. (For a list of all the original defendants, see 671 F.Supp. at 1469–70. We discuss here only those relevant to this appeal.) At the first trial, plaintiffs' primary claim was that the defendants engaged in a conspiracy to eliminate the chiropractic profession by refusing to deal with plaintiffs and other chiropractors. Defendants accomplished this, plaintiffs claimed, by using former Principle 3 of the AMA's Principles of Medical Ethics, which prohibited medical physicians from associating professionally with unscientific practitioners.[1] Plaintiffs contended that the AMA used Principle 3 to boycott chiropractors by labelling them "unscientific practitioners," and then advising its members, among others, that it was unethical for medical physicians to associate with chiropractors. According to the plaintiffs, the other defendants joined the AMA's boycott.

A jury returned a verdict for the defendants. An earlier panel of this court, however, reversed that judgment. *Wilk v. American Medical Association*, 719 F.2d 207 (7th Cir.1983) (*Wilk I*). In reversing and ordering a new trial, we held that, in applying the rule of reason, the jury had been allowed to consider factors beyond the effect of the AMA's conduct on competition. The district court had improperly failed to confine the jury's consideration to the "patient care motive as contrasted with [the] generalized public interest motive." *Id.* at 229.

Just before the 1987 retrial, plaintiffs abandoned their damages claim and sought only injunctive relief. This shifted the case's focus from the past to the present regarding whether plaintiffs were entitled to an injunction under § 16 of the Clayton Act. After a lengthy bench trial, the district court concluded that the AMA, through former Principle 3, had unreasonably restrained trade in violation of § 1 of the Sherman Act. Because the district court adequately detailed the rather

---

1. Former Principle 3 provided:
   A physician should practice a method of healing founded on a scientific basis; and he should not voluntarily associate with anyone who violates this principle.

lengthy and complex facts of this case, we only briefly summarize them here. (The facts relevant to the claims against JCAH and ACP are set out in section IV of this opinion regarding plaintiffs' cross-appeal.)

In 1963 the AMA formed its Committee on Quackery ("Committee"). The Committee worked diligently to eliminate chiropractic. A primary method to achieve this goal was to make it unethical for medical physicians to professionally associate with chiropractors. Under former Principle 3, it was unethical for medical physicians to associate with "unscientific practitioners." In 1966, the AMA's House of Delegates passed a resolution labelling chiropractic an unscientific cult.

The district court found the AMA's purpose in all of this was to prevent medical physicians from referring patients to chiropractors and from accepting referrals of patients from chiropractors, so as to prevent chiropractors from obtaining access to hospital diagnostic services and membership on hospital medical staffs, to prevent medical physicians from teaching at chiropractic colleges or engaging in any joint research, and to prevent any cooperation between the two groups in the delivery of health care services. Despite the Committee's efforts, chiropractic ultimately became licensed in all 50 states.

In 1977, the AMA's Judicial Council (now known as the Council on Judicial and Ethical Affairs, although we will use its previous name, as did the district court) adopted new opinions which permitted medical physicians to refer patients to chiropractors, as long as the physicians were confident that the services would be performed according to accepted scientific standards. In 1979, the AMA's House of Delegates begrudgingly adopted Report UU, stating that some things chiropractors did were not without therapeutic value; but even so, it stopped short of saying that these services were based on scientific standards. In 1980, the AMA revised its Principles of Medical Ethics, eliminating Principle 3. With this gesture, the district court found, the AMA's boycott ended. 671 F.Supp. at 1477. (We discuss plaintiffs' contention

that the boycott continued until 1983 in the section addressing their cross-appeal against JCAH.)

At trial, the AMA raised the so-called "patient care defense" which this court had formulated in its earlier opinion in this case. *Wilk I*, 719 F.2d at 227. That defense required the AMA generally to show that it acted because of a genuine, and reasonable, concern for scientific method in patient care and that it could not adequately satisfy this concern in a way that was less restrictive of competition. The district court rejected the defense. The court found the AMA failed to establish that throughout the relevant period (1966–1980) their concern for scientific methods in patient care had been objectively reasonable. The court also found the AMA similarly failed to show it could not adequately have satisfied its concern for scientific method in patient care in a manner less restrictive of competition than a nationwide conspiracy to eliminate a licensed profession. 671 F.Supp. at 1481–84.

The AMA settled three antitrust lawsuits in 1978, 1980, and 1986 brought by chiropractors, stipulating and agreeing that under the Judicial Council's current opinions, a medical physician could, without fear of discipline or sanction by the AMA, refer a patient to a licensed chiropractor when the physician believed that such a referral would benefit the patient. Similarly, physicians could also choose to accept or decline patients sent to them by chiropractors. The AMA also confirmed that physicians could teach at chiropractic colleges or seminars.

The AMA's present position regarding chiropractic is that it is ethical for a medical physician to professionally associate with chiropractors, if the physician believes that the association is in his patient's best interests. The district court found that the AMA had not previously communicated this position to its membership.

Based on these findings, the court held that the AMA and its members violated § 1

of the Sherman Act by unlawfully conspiring to restrain trade. According to the court, the AMA's boycott's purpose had been to eliminate chiropractic; the boycott had substantial anticompetitive effects; the boycott had no counterbalancing pro-competitive effects; and the AMA's unlawful conduct injured the plaintiffs.

Despite the fact that the district court found the conspiracy ended in 1980, it concluded that the illegal boycott's "lingering effects" still threatened plaintiffs with current injury and ordered injunctive relief. The court concluded that the boycott caused injury to chiropractors' reputations which had not been repaired, and current economic injury to chiropractors. Further, the AMA never affirmatively acknowledged that there are no impediments to professional association and cooperation between chiropractors and medical physicians, except as provided by law. Thus, chiropractors continued to suffer because the boycott's negative effects (namely, inhibiting AMA members' individual decision-making in their relationships with chiropractors) still remained. The district court believed it was important that the AMA make its members aware of the present AMA position (i.e., it is ethical for medical physicians to professionally associate with chiropractors, if the physician believes it is in the patient's best interest) to eliminate the illegal boycott's lingering effects, and ordered an injunction designed to accomplish that result. 671 F.Supp. at 1507–08 (form of injunction).

## II.

### A. *Noerr–Pennington Doctrine*

■ The AMA complains that the district court relied almost entirely on AMA conduct that was protected under the Noerr–Pennington doctrine in finding that it illegally conspired to restrain trade. *Eastern Railroad Presidents' Conference v. Noerr Motor Freight Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

*See also California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The Noerr–Pennington doctrine protects businesses and other associations when they join to petition legislative bodies, administrative agencies, or courts for actions having anticompetitive consequences. *Id. See also Wilk I,* 719 F.2d at 229. The doctrine does not, however, protect purely private action, not genuinely aimed at prompting governmental action. *See Allied Tube and Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988).

■ The AMA contends that its statements regarding chiropractors were either statements about chiropractic's deficiencies or bona fide opinions on matters of public interest. The district court acknowledged the AMA's claim and, to the extent that the Committee's work regarding influencing legislation on the state and federal levels or in informational activities to inform the public on the nature of chiropractic was involved, it did not consider such conduct in reaching its decision. *Wilk,* 671 F.Supp. at 1473 n. 2. But apart from the protected activity, the district court found substantial evidence of acts aimed at achieving the boycott's goals, not legislative action. *Id.* at 1473–77.

The court found that the AMA, through a resolution recommended by its Board of Trustees, and adopted by its House of Delegates, branded chiropractic "an unscientific cult." 671 F.Supp. at 1473. This implicitly invoked Principle 3's ethical proscription on professional association with chiropractors. Subsequent AMA action, *id.* at 1473–74, made clear the ethical bar on professional association (which included prohibiting medical physicians from referring patients to chiropractors, and from receiving referrals from chiropractors; providing diagnostic, laboratory, or radiology services for chiropractors; and from teaching chiropractors, or practicing together in any manner). The AMA widely circulated these documents. The court also found the Committee had regularly communicated with medical boards and associations, in-

forming them that professional association between medical physicians and chiropractors was unethical. 671 F.Supp. at 1473.

We disagree with the AMA that the district court "repeatedly cite[d]" AMA documents which "focus[ed] entirely on the AMA's 'vigorous educational program' and on 'the necessity to move aggressively against chiropractic in the state legislatures.'" One such document the AMA points to is an internal AMA memorandum (PX 464, Jt.App. 776–77) from the Committee to the Board of Trustees, discussing the AMA's goal of "the containment of chiropractic and, ultimately, the elimination of chiropractic." It expressly disavows any intention of using the document publicly. And while the document details some activity that was likely protected, it suggests that activity may have been done only "to minimize the chiropractic argument that the [AMA's] campaign is simply one of economics...." (Jt.App. 777). Also falling outside of the Noerr–Pennington doctrine's protection is an AMA Judicial Council opinion, holding that it was unethical for medical physicians to professionally associate with chiropractors, which was circulated to AMA members and to 56 medical specialty boards (Jt.App. 801–03). Finally, in 1973, the AMA drafted "Standard X," which incorporated the unscientific practitioners' ethical bar into the JCAH accrediting standards. At the AMA's urging, JCAH adopted Standard X.

These activities were not aimed at obtaining legislative action. They were instead aimed at medical physicians and hospitals, cautioning them that it was unethical and indeed dangerous (the obvious inference from receiving health care from an unscientific cult) to associate professionally with chiropractors. In the face of the district court's specific findings on this issue, we cannot say it erred in relying on these activities.

B. *Unreasonable Restraint of Trade*

The central question in this case is whether the AMA's boycott constituted an unreasonable restraint of trade under § 1 of the Sherman Act. A restraint is unreasonable if it falls within the category of restraints held to be *per se* unreasonable, or if it violates what is known as the "Rule of Reason." *Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447, 457–58, 106 S.Ct. 2009, 2017–18, 90 L.Ed.2d 445 (1986); *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 103, 104 S.Ct. 2948, 2961, 82 L.Ed.2d 70 (1984); *National Society of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). Restraints that are *per se* unreasonable include agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry or restraint is needed to establish their illegality. *Nat'l Society of Professional Engineers*, 435 U.S. at 692, 98 S.Ct. at 1365. Concerted refusals to deal, described as group boycotts, typically are held unlawful *per se*. See *Indiana Federation of Dentists*, 476 U.S. at 458, 106 S.Ct. at 2017; *Consolidated Metal Products, Inc. v. American Petroleum Institute*, 846 F.2d 284, 290 (5th Cir.1988). The *per se* rule avoids a burdensome inquiry into actual market conditions where the likelihood of anticompetitive effect is so obvious that the costs of determining whether the particular restraint at issue involves anticompetitive conduct is unwarranted. *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 15–16 n. 25, 104 S.Ct. 1551, 1559–60 n. 25, 80 L.Ed.2d 2 (1984). In contrast, the rule of reason category includes agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business involved, the particular restraint's history, and the reasons it was imposed. *Nat'l Society of Professional Engineers*, 435 U.S. at 692, 98 S.Ct. at 1365. The test of legality under the rule of reason is whether the challenged conduct promotes or suppresses competition. *Id.* at 691, 98 S.Ct. at 1365; *see also Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). The purpose of both approaches (*per se* or rule of reason) is to decide the restraint's competitive significance.

The Supreme Court historically has been slow to condemn rules adopted by professional associations as unreasonable *per se. Indiana Federation of Dentists,* 476 U.S. at 458, 106 S.Ct. at 2018. The Court is also reluctant to extend the *per se* rule to restraints imposed in the context of business relationships where a practice's economic impact is not immediately apparent. *Id.* Likewise, judicial inexperience with a particular arrangement cautions against extending the *per se* approach's reach insofar as judging the alleged restraint's lawfulness under the antitrust laws. *NCAA v. Board of Regents,* 468 U.S. at 100 n. 21, 104 S.Ct. at 2960 n. 21; *see also Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 294, 105 S.Ct. 2613, 2619, 86 L.Ed.2d 202 (1985); *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 344, 102 S.Ct. 2466, 2473, 73 L.Ed.2d 48 (1982); *Consolidated Metal Products,* 846 F.2d at 290. Nevertheless, the Supreme Court has not refrained from applying the *per se* approach solely on the grounds that the judiciary has little antitrust experience in the particular industry. *See Arizona v. Maricopa County Medical Society,* 457 U.S. at 349–51, 102 S.Ct. at 2475–77 (health care industry).

■ As a general rule, § 1 claims under the Sherman Act should be evaluated under the rule of reason unless the challenged action falls into the category of agreements which are deemed so harmful in their effect on competition so as to be conclusively presumed to be unreasonable and thus illegal without a detailed inquiry as to the precise harm they are alleged to have caused. *Northwest Wholesale Stationers,* 472 U.S. at 289–90, 105 S.Ct. at 2616–17; *Consolidated Metal Products,* 846 F.2d at 289–90. In this court's first go-round with this case, it held that the AMA's alleged boycott should be measured under the rule of reason. *Wilk I,* 719 F.2d at 221–22. We held that in the context of a learned profession, the nature and extent of the restraint's anticompetitive effect was too uncertain to warrant *per se* treatment. *Id.* at 221. Moreover, we looked to the Supreme Court's decisions involving professional associations (*e.g., Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466; *Nat'l Society of Professional Engineers,* 435 U.S. 679, 98 S.Ct. 1355; and *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975)), and noted the pains the Court had taken to carve out the possibility that a practice which might violate the Sherman Act in another context might not violate the Act when a learned profession was involved. *Wilk I,* 719 F.2d at 222. Thus, we concluded, "[a] canon of medical ethics purporting, surely not frivolously, to address the importance of scientific method gives rise to questions of sufficient delicacy and novelty at least to escape *per se* treatment." *Id.*

On appeal, plaintiffs urge that we change course and apply instead the *per se* rule. Plaintiffs claim that the Supreme Court's decisions in *Indiana Federation of Dentists* and *Northwest Wholesale Stationers* undercut our prior decision to treat this case under the rule of reason. But like the district court, we decline plaintiffs' invitation to revisit this issue. The Court in *Indiana Federation of Dentists* did not itself apply a *per se* rule. Nor do we read either case as requiring us to employ the *per se* analysis on the facts of this case. And, in any event, even under the rule of reason, the boycott was unlawful. *Cf. Parts and Electric Motors, Inc. v. Sterling Electric, Inc.,* 826 F.2d 712, 720–21 (7th Cir.1987) (because jury had concluded that the challenged action—an alleged tying arrangement—had unreasonably restrained competition, and had found liability under the rule of reason, it was unnecessary to decide the case under the *per se* inquiry).

■ The threshold issue in any rule of reason case is market power. *Schachar v. American Academy of Ophthalmology, Inc.,* 870 F.2d 397, 398 (7th Cir.1989); *Valley Liquors, Inc. v. Renfield Importers Ltd.,* 822 F.2d 656, 666 (7th Cir.1987) (*Valley II* ). Market power is the ability to raise prices above the competitive level by restricting output. *NCAA v. Board of Regents,* 468 U.S. at 109 n. 38, 104 S.Ct. at 2964 n. 38; *Ball Memorial Hospital,* 784

F.2d at 1331. Whether market power exists in an appropriately defined market is a fact-bound question, and appellate courts normally defer to district court findings on that issue. *Jefferson Parish Hospital*, 466 U.S. at 42, 104 S.Ct. at 1574 (O'Connor, J., concurring). Here, the district court found the relevant market to be the provision of health care services to the American public nationwide, particularly care for the treatment of musculoskeletal problems. 671 F.Supp. at 1478. Several facts demonstrated the AMA's market power within the health care services market. AMA members constituted a substantial force in the provision of health care services in the United States and they constituted a majority of medical physicians. AMA members received a much greater portion of fees paid to medical physicians in the United States than non-AMA members. *Id.* The evidence showed that AMA members received approximately 50% of all fees paid to health care providers. Finally, according to plaintiffs' expert, the AMA enjoyed substantial market power. The district court also found there was substantial evidence that the boycott adversely affected competition, and that a showing of such adverse effects negated the need to prove in any elaborate fashion market definition and market power, relying on *Indiana Federation of Dentists*, 476 U.S. at 460–62, 106 S.Ct. at 2018–20.

The AMA first contests the district court's finding of market power. It challenges the court's reliance on market share evidence as a basis to find market power and the district court's lumping together all AMA members as a group in assessing market share as a basis for its market power finding. We are not convinced the trial court erred. The district court properly relied on the AMA membership's substantial market share in finding market power. While we cautioned against relying solely on market share as a basis for inferring market power in *Ball Memorial Hospital*, 784 F.2d at 1336, we did not rule out that approach. *Id.* *See also Parts and Electric Motors*, 826 F.2d at 720 n. 7; *Valley II*, 822 F.2d at 666–67. This is especially so where there are barriers to entry and no substitutes from the consumer's perspective. *Ball Memorial Hospital*, 784 F.2d at 1336. Here the district court found the AMA membership was a substantial force in the American health care market, and that there were substantial barriers to the entry of new chiropractors into the field, such as substantial education requirements, 671 F.Supp. at 1479.

The district court also relied on substantial evidence of adverse effects on competition caused by the boycott to establish the AMA's market power. In *Indiana Federation of Dentists*, the Supreme Court explained that since "the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as reduction of output' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.' " 476 U.S. at 460–61, 106 S.Ct. at 2018–19, quoting 7 P. Areeda, *Antitrust Law* ¶ 1511, p. 429 (1986). *See also*, P. Areeda, *The Rule of Reason—A Catechism on Competition*, 55 Antitrust Law Journal 571, 577 (1986). Thus, the district court recited the boycott's anticompetitive effects:

> It is anticompetitive and it raises costs to interfere with the consumer's free choice to take the product of his liking; it is anticompetitive to prevent medical physicians from referring patients to a chiropractor; (Lynk—1427–28) it is anticompetitive to impose higher costs on chiropractors by forcing them to pay for their own x-ray equipment rather than obtaining x-rays from hospital radiology departments or radiologists in private practice; and it is anticompetitive to prevent chiropractors from improving their education in a professional setting by preventing medical physicians from teaching or lecturing to chiropractors. (Tr. 1409–22, 1424–31.)

671 F.Supp. at 1478–79. *See also Wilk I*, 719 F.2d at 214. These findings eliminated the need for an inquiry into market power.

■ The AMA's attempts to discredit the evidence the district court relied on to find

anticompetitive effects are unavailing. The record does not show, as the AMA contends, that forcing chiropractors to purchase their own x-ray equipment had no adverse effect on chiropractors. And the district court did not clearly err in finding that former Principle 3 reduced demand for chiropractic services simply because there was evidence that a patient had seen a chiropractor before and after having seen a medical physician. Moving on, the AMA argues that even if market power existed, it escapes liability under the rule of reason because former Principle 3 had overriding procompetitive effects. The AMA's argument is not unpersuasive in the abstract; but unfortunately it relies on evidence which the district court rejected as "speculative." 671 F.Supp. at 1479. Essentially, the AMA argues that the market for medical services is one where there is "information asymmetry." In other words, health care consumers almost invariably lack sufficient information needed to evaluate the quality of medical services. This increases the risk of fraud and deception on consumers by unscrupulous health care providers possibly causing what the AMA terms "market failure": consumers avoiding necessary treatment (for fear of fraud), and accepting treatment with no expectation of assured quality. The AMA's conduct, the theory goes, ensured that physicians acquired reputations for quality (in part, by not associating with unscientific cultists), and thus allowed consumers to be assured that physicians would use only scientifically valid treatments. This in effect simultaneously provided consumers with essential information and protected competition.

Getting needed information to the market is a fine goal, but the district court found that the AMA was not motivated solely by such altruistic concerns. Indeed, the court found that the AMA intended to "destroy a competitor," namely, chiropractors. It is not enough to carry the day to argue that competition should be eliminated in the name of public safety. *See Nat'l Society of Professional Engineers*, 435 U.S. 679, 98 S.Ct. 1355.

But the AMA persists in arguing that pro-competitive effects were achieved by the boycott through what its expert called "nonverbal communication." In rejecting this argument, the district court stated that the AMA's expert's

> theory is that the boycott constituted nonverbal communication which informed consumers about the differences between medical physicians and chiropractors, and that this had a pro-competitive effect. (Tr. 1411–12.) I reject this opinion as speculative. (Tr. 1434–43.) Mr. Lynk [William J. Lynk, the AMA's expert] neither conducted nor read any studies regarding the efficacy of such nonverbal communications. *Id.* He neither conducted nor read any surveys of consumer opinion to determine whether consumers were confused about the differences between medical physicians and chiropractors. (*Id.*) I saw no evidence of any such confusion during the trial. Mr. Lynk's opinion does not accord with common sense. A nationwide conspiracy intended by its participants to contain and eliminate a licensed profession cannot be justified on the basis of Mr. Lynk's personal opinion that it was pro-competitive, nonverbal communication to consumers.

671 F.Supp. at 1479. We find the district court's reasoning compelling.

The AMA, however, argues that the district court missed the boat in rejecting Mr. Lynk's theory. The relevant question, according to the AMA, is not whether consumers would perceive any differences between physicians and chiropractors today; rather, it is whether they would ever view a physician's *referral* of a patient to a chiropractor as a physician's endorsement of the chiropractor's practices. But the AMA misses the essence of the district court's ruling. The trial court rejected the AMA's theory as speculative because Lynk neither conducted nor read any studies regarding nonverbal communications; his views were only his "personal opinion." 671 F.Supp. at 1479. In fact, Lynk testified that an empirical study could not even be performed to determine the pro-competitive effects of Principle 3. (Jt.App. at 351–52.) Thus, even if the AMA is right in

asserting that the relevant inquiry is how a physician's referral would be viewed by the consumer, there was no underlying study or data to support its theory.

Moreover, Lynk's testimony did not bear out the AMA's assertions regarding the "relevant question." The AMA says that it is irrelevant to its theory whether health care consumers perceive any differences between chiropractors and medical physicians, and that Lynk's testimony went to the role of reputation and information in health care service markets. But in testifying as to the pro-competitive function of standards generally, Lynk testified that they improve consumer information by making it possible for consumers to make more informed choices "about whatit is they are getting from alternative sellers of the same or substitute products to the extent that it allows them to make better choices." (Jt.App. 343.) Lynk also testified that one of the interests served by former Principle 3 was that it would clarify the distinctions between the profession of medicine and alternative professions "that are not based on medical science but which can create the appearance that they are." (Jt.App. 351.) This seems to go precisely to the perceived differences between chiropractors and medical physicians.

In sum, we agree with the district court that the AMA's boycott constituted an unreasonable restraint of trade under § 1 of the Sherman Act under the rule of reason. Therefore, the district court's findings that the AMA's boycott was anticompetitive, and was not counter-balanced by any procompetitive effects were not erroneous. *Nat'l Society of Professional Engineers*, 435 U.S. at 691, 98 S.Ct. at 1365.

## C. *Patient Care Defense*

In the AMA's first appeal, we modified the rule of reason to allow the AMA to justify its boycott of chiropractors if it could show that it was motivated by a concern for "patient care." *Wilk I*, 719 F.2d at 227. We were persuaded that measuring former Principle 3's reasonableness required a more flexible approach than the traditional rule of reason inquiry provided.

*Id.* at 226–27. Thus, we explained that if plaintiffs met their burden of persuasion on remand by showing that former Principle 3 and the implementing conduct had restricted competition rather than promoting it, the burden of persuasion would shift to the defendants to show:

> (1) that they genuinely entertained a concern for what they perceive as scientific method in the care of each person with whom they have entered into a doctor-patient relationship; (2) that this concern is objectively reasonable; (3) that this concern has been the dominant motivating factor in defendants' promulgation of Principle 3 and in the conduct intended to implement it; and (4) that this concern for scientific method in patient care could not have been adequately satisfied in a manner less restrictive of competition.

*Id.* at 227.

In this appeal, plaintiffs ask us to reconsider the patient care defense, urging that three subsequent Supreme Court decisions have implicitly rejected it; *see Patrick v. Burget*, 486 U.S. 94, 104–05, 108 S.Ct. 1658, 1665, 100 L.Ed.2d 83 (1988); *Indiana Federation of Dentists*, 476 U.S. at 458–60, 106 S.Ct. at 2017–19; and *Jefferson Parish Hospital Dist. No. 2*, 466 U.S. at 25 n. 41, 104 S.Ct. at 1565 n. 41. While these decisions may cast doubt on the patient care defense's continuing vitality, they did not address the specific issue of whether the patient care defense on the facts in this case would be allowed. While we acknowledge that there has been some academic criticism of the defense (*see* Kissam, *Antitrust Boycott Doctrine*, 69 Iowa L.Rev. 1165, 1214–16 (1984); Havighurst, *Doctors and Hospitals; An Antitrust Perspective on Traditional Relationships*, 1984 Duke L.J. 1071, 1103 n. 101 (1984)), we need not revisit the issue because the district court's finding that the AMA did not satisfy its burden of persuasion under the defense was not clearly erroneous.

The district court held that the AMA failed to meet the defense's second and fourth elements: that its concern for scientific method in patient care was objectively reasonable, and that the concern for scien-

tific method in patient care could not have been satisfied adequately in a manner less restrictive of competition, respectively. While only those two rulings are at issue, it is useful to summarize the district court's treatment of the entire defense.

Although doubting the AMA's genuineness regarding its concern for scientific method in patient care, the district court concluded that the AMA established that element. While it was attacking chiropractic as unscientific, the AMA simultaneously was attacking other unscientific methods of disease treatment (e.g., the Krebiozen treatment of cancer), and, as the district court noted, the existence of medical standards or guidelines against unscientific practice was relatively common. 671 F.Supp. at 1481. The court, however, found that the AMA failed to carry its burden of persuasion as to whether its concern for scientific method in patient care was objectively reasonable.

The court acknowledged that during the period that the Committee on Quackery was operating, there was plenty of material supporting the belief that all chiropractic was unscientific. But, according to the court (and this is unchallenged), at the same time, there was evidence before the Committee that chiropractic was effective, indeed more effective than the medical profession, in treating certain kinds of problems, such as back injuries. The Committee was also aware, the court found, that some medical physicians believed chiropractic could be effective and that chiropractors were better trained to deal with musculoskeletal problems than most medical physicians. Moreover, the AMA's own evidence suggested that at some point during its lengthy boycott, there was no longer an objectively reasonable concern that would support a boycott of the entire chiropractic profession. Also important was the fact that "it was very clear" that the Committee's members did not have open minds to pro-chiropractic arguments or evidence. 671 F.Supp. at 1481–83.

Next, the court found that the AMA met its burden in establishing that its concern about scientific method was the dominant motivating factor for promulgating former Principle 3, and in the conduct undertaken and intended to implement it. 671 F.Supp. at 1483. But even so, the court acknowledged there was evidence showing that the AMA was motivated by economic concerns, as well.

Finally, the court concluded that the AMA failed to meet its burden in demonstrating that its concern for scientific method in patient care could not have been satisfied adequately in a manner less restrictive of competition. The court stated that the AMA had presented no evidence of other methods of achieving their objectives such as public education or any other less restrictive approach. 671 F.Supp. at 1483.

The AMA attacks the district court's findings as to the second element (concern for scientific method as objectively reasonable), claiming that the court rewrote the element to require the AMA to show its concern with chiropractic (rather than with scientific patient care) was objectively reasonable. *Wilk*, 671 F.Supp. at 1481. We disagree. The AMA's claim in passing that the court "misconceiv[ed]" the defense is barely explained in one of its 67 footnotes; but in any event, we think the district court was true to the defense and adequately supported its holding with several key factual determinations. It recited the evidence directly at odds with the AMA's belief that all chiropractic was unscientific. 671 F.Supp. at 1481–83. The AMA does not challenge the district court's findings, so those findings must stand. Beyond that, the AMA reads this element too rigidly. The issue here is whether its concern for scientific method in the care of patients was objectively reasonable. In the context of this particular case, then, the question is whether that concern justified a boycott of chiropractic. Based on the undisputed facts, it did not.

The AMA's challenge to the fourth element (concern for scientific method in patient care could not have been adequately satisfied in a manner less restrictive of competition) is equally unpersuasive. The AMA completely fails to offer any evidence to support its burden. Instead, it argues

that its former guideline had at most a *de minimis* effect on chiropractors' costs, and thus could not be treated as an attempt to contain and eliminate the entire chiropractic profession. This, however, ignores the fact that the AMA's self-proclaimed and described "mission" was to contain, and ultimately eliminate chiropractic. (Jt. App. 776.) The AMA participated in a nationwide boycott and conspiracy designed to contain and eliminate a profession that was licensed in all fifty states at the time the Committee on Quackery was disbanded. As the district court held, it is "a difficult task" to argue that this was "the only way to satisfy the AMA's concern for the use of scientific method in patient care." 671 F.Supp. at 1483. Furthermore, we reject the AMA's attempts to minimize the effect its boycott had on competition. The district court found the boycott had several anticompetitive effects, such as raising costs by interfering with consumers' free choice, which are unrefuted. 671 F.Supp. at 1478–79, 1480.[2]

### D. *Antitrust Injury*

To seek an injunction under § 16 of the Clayton Act, a private plaintiff must allege "threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Cargill Inc. v. Monfort of Colorado Inc.*, 479 U.S. 104, 113, 107 S.Ct. 484, 491, 93 L.Ed.2d 427 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)). Here, the district court concluded that plaintiffs had shown the kind of injury the antitrust laws were designed to pre-

vent. 671 F.Supp. at 1479–80. Plaintiff's economic expert (Stano) compared chiropractors' incomes with podiatrists' and optometrists' incomes (comparable limited license practitioners) over the relevant period of time and concluded that chiropractors' incomes had been lower than both. This Styno viewed as consistent with plaintiffs' boycott theory. He also concluded that a jump in chiropractors' incomes during the 1978–1980 period was consistent with the acknowledged lessening of the boycott by the AMA during that time. Lynk, the AMA's economic expert, though he faulted the data plaintiffs' expert relied upon, agreed that if he were to compare chiropractors' incomes to comparable groups, he also would include podiatrists and optometrists (although he stated he would seek further explanations for differences between the groups' incomes). In the district court's view, further support for plaintiffs' theory of harm was the "very strong evidence of a pervasive, nationwide, effective conspiracy which by its very nature would have affected the demand curve for chiropractic services and adversely affected the income of chiropractors." 671 F.Supp. at 1480. Finally, the district court added, there was evidence of injury to reputation suffered by chiropractors. (Both economic experts, according to the court, believed that injury to reputation would constitute an anticompetitive effect of the boycott.)

The AMA argues that plaintiffs failed to establish an antitrust injury. Essentially the argument goes somewhat like this. This case is not a class action; rather, it involves only the four named plaintiffs. The only harm here would have been to

---

**2.** The AMA's assertion that former Principle 3 operated to prevent the "free-riding" that would have occurred if physicians had referred patients to chiropractors misses the mark. Apparently, the AMA believes that if physicians were forced to refer patients to chiropractors, chiropractors would benefit (the "free ride") from the physicians' reputation for providing quality medical service, without necessarily deserving that reputation themselves. But neither this court nor the district court would require the AMA to endorse chiropractic, nor do we mandate that there be referrals. We simply speak to the restraint on professional association, and

say that physicians, hospitals, and other institutions must be free to make their own uncoerced decisions on whether to professionally associate with chiropractors. We do not compel medical physicians to praise or sponsor chiropractors' work. *See Schachar v. American Academy of Ophthalmology*, 870 F.2d 397, 399 (7th Cir. 1989). We do not even require "cooperation or friendliness." *Id.* We also note that the AMA apparently misconceives the role of the free-riding analysis in antitrust law. *See Premier Electrical Construction Co. v. National Electrical Contractors Ass'n Inc.*, 814 F.2d 358, 368–70 (7th Cir.1987) (explaining the concept).

"scientific" chiropractors. Because, according to the AMA (but not the district court), plaintiffs were not and are not "scientific practitioners," they could not have suffered any injury from former Principle 3. If any chiropractors could establish antitrust injury, it would be those who have "renounced the theory of sublaxations and limit their practices to conservative physical therapy modalities." The AMA's argument thus hinges on its lengthy assertion that the four plaintiffs are "unscientific practitioners." The problem with this approach, however, is that the district court did not agree with the AMA that the plaintiffs were "unscientific" practitioners. Although the court acknowledged that there was some evidence that the plaintiffs did not use common methods in treating common symptoms, and that the treatment of patients appeared to be undertaken on an ad hoc rather than on a scientific basis, it did not go so far as the AMA believes, and establish or find that the plaintiffs in this case were "unscientific practitioners." Indeed, it expressly held that no one involved in the case, including the plaintiffs, believed that chiropractic treatment should be used for treatment of diseases such as cancer, diabetes, heart disease, high blood pressure, and infections. 671 F.Supp. at 1482. Regardless, neither the district court, nor this court is equipped to determine whether chiropractic is "scientific" or not. So the AMA's argument must fail in any event. We see the AMA's argument here as yet another invitation to tackle the question of whether chiropractic is "either good or bad, efficacious or deleterious, quackery or science." 671 F.Supp. at 1481. The district court repeatedly stated it was not deciding whether chiropractic was scientific. 671 F.Supp. 1482 n. 8, 1482–83, 1506–07. Yet both sides (below it was plaintiffs, 671 F.Supp. at 1482; here, it is the AMA) continue to color their arguments with how they view their own, or the

other side's, profession. Like the district court, we do not see our task as deciding whether or not chiropractic is scientific.

The AMA also quibbles with the evidence of antitrust injury. The district court rejected the same arguments. 671 F.Supp. at 1480. We too are unpersuaded. The AMA offers no good reason why we should accept its expert's opinion over that of the plaintiffs', and we decline to do so. But beyond that, the district court relied on more than just plaintiffs' expert in determining there was an antitrust injury. It also relied on the evidence of the "pervasive, nationwide, effective conspiracy which by its very nature would have affected the demand curve for chiropractic services and therefore adversely affected income of chiropractors." 671 F.Supp. at 1480. (Further, we also note that the AMA is far too generous in its characterization of plaintiffs' expert's "concession" that the AMA's conduct was "lawful and pro-competitive.")

The evidence established that all chiropractors' incomes were lower than those of comparable limited license practitioners. And the evidence was that all chiropractors suffered an injury to their reputation. 671 F.Supp. at 1480. Indeed, the district court found that the individual plaintiffs suffered rejections and lost opportunities and that "the individual plaintiffs have been personally harmed, and continue to be personally threatened, by a lack of association with members of the AMA caused by the boycott and the lingering effects of the boycott." 671 F.Supp. at 1486. Moreover, the court stated that "[t]he activities of the AMA undoubtedly have injured the reputation of chiropractors generally. This kind of injury more likely than not was sustained by the four plaintiffs." *Id.* This directly refutes the AMA's contention that there was nothing but a showing of "classwide injury." [3]

**3.** The AMA cites *United States v. Borden Co.,* 347 U.S. 514, 74 S.Ct. 703, 98 L.Ed. 903 (1954), for the proposition that a showing of classwide injury is insufficient to support injunctive relief for an individual plaintiff. While that might be true, *Borden* does not say so. There, the Supreme Court held that in light of the differences

in the interests sought to be vindicated by the government and by private litigants in actions under the Clayton Act, the government was not precluded from obtaining injunctive relief against price discrimination simply because, in an earlier private action, a decree enjoined the conduct in question. At any rate, the trial court

### III.

*Entitlement To Injunctive Relief*

Section 16 of the Clayton Act provides that:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings....

15 U.S.C. § 26. Although the district court concluded that the AMA's boycott ended in 1980 (when former Principle 3 was eliminated), it held that an injunction nevertheless was necessary in this case.

The trial court concluded there were lingering effects of the AMA's conspiracy; that the AMA never acknowledged the lawlessness of its past conduct, and in fact continued to maintain that it had always been in compliance with the antitrust laws; that the AMA had never affirmatively stated that it was ethical for medical physicians to professionally associate with chiropractors; that the AMA had never publicly stated to its members the admissions made in the trial court about chiropractic's improved nature, despite the fact that the AMA currently claims that it made changes in its policy in recognition of chiropractic's change and improvement; that the AMA never publicly retracted articles such as "The Right and Duty of Hospitals to Deny Chiropractor Access to Hospitals"; that a medical physician had to read very carefully the current AMA Judicial Council opinions to realize that there had been a change in the treatment of chiropractors; and, finally, that the AMA's systematic, long-term wrongdoing and long-term intent to destroy chiropractic "suggest[ed]" that an injunction was appropriate. 671 F.Supp. at 1488. The court believed that it was important to make AMA members aware of the AMA's present position—that it is ethical

for medical physicians to professionally associate with chiropractors, if the physician believes it is in his patient's best interest—to eliminate the unlawful boycott's lingering effects. The injunction, then, is to "assure that the AMA does not interfere with the right of a physician, hospital or other institution to make an individual decision on the question of professional association." 671 F.Supp. at 1507.

The injunction requires the AMA to arrange publication of the district court's order in the *Journal of the American Medical Association,* mail the order to each of the AMA's members, and revise the current opinions of the AMA's Council on Judicial and Ethical Affairs (formerly the Judicial Council) so that it states the AMA's present position on chiropractic in a separate provision, with a heading and index references referring to chiropractors. 671 F.Supp. at 1507–08.

■ The AMA correctly points out that the district court wrongly placed the burden of proof on the AMA in deciding whether injunctive relief was appropriate in this case. But the AMA does not argue how, if at all, the court's error prejudiced it. We do not think the AMA was prejudiced.

The district court treated the AMA's argument in this respect as an argument that the claim for injunction was moot instead of an argument that no injunctive relief was necessary. Although these concepts are similar, they are analytically distinct, and a court could find that a case is not moot yet deny injunctive relief. *See United States v. Concentrated Phosphate Export Association, Inc.,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968); *U.S. v. W.T. Grant,* 345 U.S. 629, at 633, 73 S.Ct. 894, at 898, 97 L.Ed. 1303 (1953); *TRW, Inc. v. Federal Trade Commission,* 647 F.2d 942, 953–54 (9th Cir.1981); *SCM Corporation v. Federal Trade Commission,* 565 F.2d 807, 812 (2d Cir.1977). There are practical differences between the

---

here relied on more than evidence of "classwide injury" in finding that these four plaintiffs were

injured by the AMA's unlawful boycott.

concepts, as well. The mootness burden is a heavy one, and the *defendant* must show that there is no reasonable expectation that the wrong will be repeated. By contrast, the burden for showing whether injunctive relief is necessary is on the *moving party;* here plaintiffs. The district court wrongly placed the burden of persuasion on the AMA. 671 F.Supp. at 1484. But no matter which party bore the burden on this issue, the district court's ultimate findings leave no doubt that injunctive relief was appropriate.

A party moving for an injunction must show some cognizable danger of recurrent violation, that is, something more than the mere possibility which serves to keep the case alive. *W.T. Grant,* 345 U.S. at 633, 73 S.Ct. at 898. "To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations." *Id.* Courts require "clear proof" that an unlawful practice has been abandoned, and must guard against attempts to avoid injunctive relief "by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is a probability of resumption." *U.S. v. Oregon State Medical Society,* 343 U.S. 326 at 333, 72 S.Ct. 690, at 695, 96 L.Ed. 978 (1952). These issues are committed to the trial court's discretion. *Id.* 345 U.S. at 634, 73 S.Ct. at 898; *see also U.S. v. Concentrated Phosphate,* 393 U.S. at 203–04, 89 S.Ct. at 364. Thus, we will not substitute our judgment for the district court's. The question is not how we would rule if we were addressing the question in the first instance. Rather, the question is whether the district court's decision was reasonable. *See United States v. United States Currency in the Amount of $103,387.27,* 863 F.2d 555, 561 (7th Cir.1988).

■ We believe the court's decision was reasonable. It found a cognizable danger of recurrent violations, was unimpressed with the AMA's expressed intent to comply with antitrust laws, was unpersuaded by the effectiveness of the AMA's discontinuance of its boycott, and properly considered the systematic and long-term na-

ture of the boycott. *W.T. Grant,* 345 U.S. at 633, 73 S.Ct. at 897.

The AMA characterizes many of its challenges to the district court's decision to order an injunction as attacks on the court's findings of fact. Thus, for example, the AMA argues that the district court "erroneously found a risk of recurrence." But the facts are relatively undisputed. The AMA is really challenging the district court's decision that those facts supported an injunction.

In this regard, the district court found that the AMA's behavior in connection with the 1983 revision of the JCAH accreditation standards for hospitals indicated the AMA's likelihood of returning to its old (anti-chiropractic) ways. (The facts surrounding the 1983 revisions are set out more fully in section IV below, in connection with plaintiffs' cross appeal against JCAH.) The AMA's original position toward those standards was favorable to chiropractors in that it supported the JCAH position that each hospital be permitted to decide for itself, under applicable state law, which licensed health care providers would be allowed hospital privileges and membership on the medical staff. However, after an outcry from its membership the AMA was forced to change its original position to satisfy its constituents, namely, medical physicians; it thus sought to have JCAH approve a more restrictive accreditation standard which would ensure medical and osteopathic physicians control of the medical staff and patient care in hospitals. 671 F.Supp. at 1476, 1488. This incident led the trial court to conclude that the AMA's "present assurances [were] good only until the next chiropractic battle." *Id.* at 1488.

The facts surrounding the 1983 JCAH revisions are not in dispute. Even so, the AMA terms the district court's reliance on this incident as "baffling." Thus, it contends that even under the district court's injunction order it will still be allowed to urge restrictions on chiropractors before recognized accrediting bodies, and that its conduct regarding the JCAH standards would be consistent with that mandate. The AMA also argues that the district

court's conclusion that the JCAH's 1983 revision was reasonable, indeed proper, validates the AMA's call to action to ensure medical and osteopathic physician control of medical staff and patient care. We disagree.

While the AMA, under the district court's order, may in the future be free to urge restrictions or take positions with respect to chiropractic, the AMA's action with respect to the 1983 JCAH revisions must be viewed in the context in which it occurred. It came on the heels of a lengthy illegal boycott of chiropractors. And although the AMA believed the JCAH's initial standards were consistent with the then current antitrust legal climate, it was unable to maintain its position in the face of a barrage of criticism from its members. 671 F.Supp. at 1476–77. That coupled with the fact that the district court found the AMA even through the date of trial continued to respond to requests for information on chiropractic by sending out anti-chiropractic literature, id., was enough for the district court properly to conclude that there was evidence that suggests a possible return to the AMA's former policies. Finally, the JCAH's action in 1983, although found reasonable and proper, is wholly distinct from the AMA's action. JCAH was an independent body, motivated by completely different concerns. Thus, while the AMA was attempting to contain and eliminate competitors (i.e., chiropractic), JCAH was acting only to assure that responsibility for patient care in acute care hospitals remained in the hands of medical and osteopathic physicians, the only practitioners who could perform that acute care.

In challenging the need for an injunction, the AMA also contends that it is legally bound by settlements in three separate chiropractic antitrust lawsuits to the position that chiropractors are licensed limited practitioners and that no form of professional association with chiropractors is unethical. These settlements, according to the AMA, eliminate any threat that the boycott will recur. Again, we disagree. Although the settlements may be some evidence militating against the likelihood of recurrence, it is not so strong as to reverse the district court's determination. The trial court considered this evidence, 671 F.Supp. at 1487–88, but found it was outweighed by other evidence (recited above in connection with the JCAH 1983 revisions) of a risk of a return to the AMA's former policies. Id. at 1488. Notably, the district court found it relevant that in all of the settlements, there was no admission of liability.

The AMA additionally argues that the permanence of its post–1977 guidelines (and hence the unlikelihood of a return to its old ways) is emphasized by the "fact" that they were undertaken entirely independently of this lawsuit. However, the district court never found this "fact"; and the district court could properly be skeptical of the AMA's "protestations of repentance and reform," Oregon State Medical Society, 343 U.S. at 333, 72 S.Ct. at 696, especially since the AMA's change of position occurred not too long after this suit was filed in 1976.

Another factor supporting the injunction is that the AMA still vigorously maintains that its boycott activity was lawful, and has never acknowledged its past conduct's lawlessness. This coupled with the AMA's begrudging statement on professional association with chiropractors was sufficient for the district court to doubt (1) the AMA's intent to comply with the antitrust laws in the future absent an injunction, and (2) the effectiveness of the discontinuation of its illegal conduct. Importantly, the district court found that even as of the trial date, the AMA continued to respond to requests for information on chiropractic by sending outdated anti-chiropractic literature. Further, none of the AMA's policies contain any affirmative statement that the boycott is over. An example of the AMA's begrudging and ineffective removal of the ethical bar to professional association is Opinion 3.01 of its Judicial Council. The AMA cites Opinion 3.01 as evidence that its revised guideline has eliminated the prior guidelines on chiropractic, and removed any negative references to specific licensed limited practitioners. But as the district court noted, Opinion 3.01 is entitled "Non-

scientific Practitioners." [4] Thus, the AMA member still must look under the heading "Nonscientific Practitioners" to discover that it is now permissible to associate with chiropractors. Any beneficial effect of Opinion 3.01 likely is lost because it is buried in a category almost certain to conjure up the ethical prohibitions of the past.

Yet another factor supporting an injunction is what the district court termed the boycott's "lingering effects." The court found not only that plaintiffs had been personally harmed by the boycott, but that they continued to be personally harmed and threatened by a lack of association with members of the AMA as a result of the boycott and its lingering effects. 671 F.Supp. at 1486. The boycott, while it was in full bloom, "more likely than not affected individual decision-making by AMA members and other medical physicians in their relationship with chiropractors;" and until AMA members learn that the AMA's policies in fact have changed, AMA members' decision-making with respect to professional association with chiropractors will continue to be affected, according to the trial court. The evidence amply supported this conclusion. It is based not only on the lengthy and successful boycott, but on the begrudging nature of the AMA's more recent and lawful changes.

The district court also found a continuing injury to chiropractors' reputation as a result of the boycott. Because the AMA has never made any attempt to publicly repair that damage, the court found that chiropractors will continue to suffer injury to reputation from the boycott. 671 F.Supp. at 1486–87. The AMA's publication of its changes and its settlements were not enough, in the eyes of the district court, to overcome these harmful effects. The AMA has not convinced us that the district court was wrong in this assessment.

The AMA's strongest challenge comes to the district court's findings with respect to the lingering effects on chiropractors' incomes. The court found that the injury to chiropractors' incomes threatened to continue through the date of trial. 671 F.Supp. at 1487. For this it relied on plaintiffs' expert's analysis regarding chiropractic income levels through 1986. (Jt. App. 57.) The court found this continuing harm existed, even though plaintiffs' expert's last data point showed that chiropractors' income in 1984 exceeded that of podiatrists and optometrists—the comparable professions. 671 F.Supp. at 1487. The

---

4. In 1980, the AMA adopted a new set of "Principles of Medical Ethics" that replaced the former "Principles" that had been in place since 1957. The 1980 "Principles" provide in part:

**3.00 OPINIONS ON INTERPROFESSIONAL RELATIONS**

**3.01. NONSCIENTIFIC PRACTITIONERS.** It is wrong to engage in or to aid and abet in treatment which has no scientific basis and is dangerous, is calculated to deceive the patient by giving him false hope, or which may cause the patient to delay in seeking proper care until his condition becomes irreversible.

Physicians should also be mindful of state laws which prohibit a physician from aiding and abetting an unlicensed person in the practice of medicine, aiding or abetting a person with a limited license in providing services beyond the scope of his license, or undertaking the joint medical treatment of patients under the foregoing circumstances.

A physician is otherwise free to accept or decline to serve anyone who seeks his services, regardless of who has recommended that the individual see the physician.

**3.02 OPTOMETRY.** It is not unethical for an ophthalmologist to employ an optometrist as ancillary personnel to assist him provided the optometrist is identified to patients as an optometrist. A physician may send his patient to a qualified and ethical optometrist for optometric services. The physician would be ethically remiss, of course, if before doing so he did not insure that there was an absence of any medical reason for his patient's complaint, and he would be equally remiss if he sent a patient without having made a medical evaluation of the patient's condition.

Physicians may teach in recognized schools of optometry for the purpose of improving the quality of optometric education. The scope of this teaching may embrace subjects within the legitimate scope of optometry which are designed to prepare students to engage in optometry within the limits prescribed by law. (Jt.App. 1416.) Compare the treatment of optometrists and chiropractors. One has to look in the category of "nonscientific practitioners" to learn that it is ethical to associate with chiropractors. But there is a separate section devoted to optometrists, about whom the AMA at one time had some very negative things to say. 671 F.Supp. at 1487.

court did not, however, "find," as the AMA contends, that chiropractors' incomes had actually increased in 1984; rather, it only acknowledged the expert's data in this regard. *Id.* Obviously, given its finding regarding 1986 income levels (i.e., that chiropractors' incomes continued to suffer), the court was more persuaded by the expert's income projections into 1986 regarding the lagging of chiropractors' income, than by the 1984 data. The AMA's assertion that there is no basis for the district court to rely on the projection of chiropractors' income is baseless. There was testimony that chiropractors' incomes would still have suffered in 1986 as a result of the boycott. (Jt.App. 57.) But even without the lingering effects on chiropractors' income, there still remain the effects on professional association and reputation, which by themselves may be sufficient to show continuing harm from the boycott.

In sum, even though the district court wrongly allocated the burden of proof in deciding whether injunctive relief was necessary, its ultimate findings regarding the risk of a return to the unlawful policies, the effectiveness of the AMA's discontinuance or voluntary cessation, and the character of the past violations, without question satisfy the proper standard. *W.T. Grant,* 345 U.S. at 633, 73 S.Ct. at 897. None of the objections the AMA raises on appeal undercuts the district court's decision to grant an injunction. That the AMA feels an injunction is not necessary (or for that matter, that even we may have felt the same had we considered the case as an original matter), is not the appropriate test. That call was for the district court to make. *Id.* Because the district court did not abuse its discretion, we uphold its decision to award injunctive relief.[5]

Anticipating this negative (for it) result, the AMA makes a last-ditch perfunctory argument. It attacks the injunction, arguing that it is unnecessarily overbroad, purports to award classwide relief in a case that was never certified as a class action, and "implicate[s] the AMA's rights under the First Amendment." None of these arguments are convincing.

■ True enough, as the AMA observes, an injunction in a private antitrust suit should award a plaintiff injunctive relief "only to the extent necessary to protect it from future damage likely to occur if the defendant continues the unlawful antitrust conduct." *Ohio–Sealy Mattress Manufac-*

---

5. Based on the language in section 16 that equitable relief is available "when and under the same conditions and principles as injunctive relief ... is granted by courts of equity....," the AMA makes a passing argument, buried in two of its 67 footnotes (two footnotes, incidentally, that are separated by seven pages of text) that the district court erred by not requiring the plaintiffs to meet all the requirements for an injunction that traditional equity jurisprudence imposes. The AMA does not bother to say what those traditional equitable requirements are, in the case of a permanent injunction, except to say that the plaintiffs had to show they had no adequate remedy at law. Nor does the AMA cite any cases concerning the propriety of a permanent injunction under § 16.

The Supreme Court has stated § 16 invokes "traditional equitable principles." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969); see also *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 386 (7th Cir.1984). Scholarly comment has echoed this theme. *E.g.,* 2 P. Areeda and D. Turner, *Antitrust Law* § 312d (1978); Easterbrook and Fischel, *Antitrust Suits by Targets of Tender Offers,* 80 Mich. L.Rev. 1155, 1168–69 (1982). Section 16's language indicates that traditional equity principles should apply. But while it is true that the district court stated that the plaintiffs did not have to meet all the traditional equitable requirements for an injunction, we are not convinced that this misstatement affected the court's analysis. The important point is that equitable relief is discretionary, and not automatically available to an injured plaintiff. See Areeda & Turner, *supra,* § 312d at 39. The district court did exercise discretion and did not automatically grant the plaintiffs an injunction. The court carefully weighed the AMA's conduct, the likelihood it would recur, the harm it caused and might in the future cause, and we believe, implicitly in all this, the relative hardships to the parties of granting an injunction. *See* 671 F.Supp. at 1484–88.

It is true that the district court did not specifically find that the plaintiffs had no adequate remedy at law. The AMA baldly asserts that damages would have been adequate, but does not mention how. At any rate, at this stage in the case, we are not inclined to reverse the district court's careful decision based on an underdeveloped argument that the AMA did not even deem worthy of including under a separate heading in the text of its brief.

*turing Co. v. Sealy, Inc.*, 669 F.2d 490, 495 (7th Cir.1982). But beyond this general principle, the AMA does not make any genuine argument that the injunction is overbroad. Instead, it simply asserts that the primary beneficiaries of the district court's order, insofar as it requires the order to be mailed to every AMA member, that it be published in the *Journal of the American Medical Association,* and that the AMA revise a national ethical publication, are the some 30,000 chiropractors in the nation as a whole who were not parties to this case. Doubtless, these other chiropractors may benefit from the mass mailing and publication required by the district court's order. But this does not necessarily make the injunction overbroad.

The AMA's suggestion that the publications and mailings should have been limited to the four communities in which the individual plaintiffs practiced unnecessarily limits the relief, and ignores the public interest served by private antitrust suits. Such suits can effectively open competition to a market that was previously closed by illegal restraints. *National Society of Professional Engineers,* 435 U.S. at 698, 98 S.Ct. at 1368; *see also International Salt Co. v. United States,* 332 U.S. 392, 401, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947). Relief here is provided not only to the plaintiff chiropractors, but also in a sense to all consumers of health care services. Ensuring that medical physicians and hospitals are free to professionally associate with chiropractors (e.g., by the publication and mailing of the order to AMA members), likely will eliminate such anticompetitive effects of the boycott as interfering with consumers' free choice in choosing a product (health care provider) of their liking. In this way competition is served by the injunction. In short, the injunction, as designed by Judge Getzendanner, reasonably attempts to eliminate the consequences of the AMA's boycott, and we will not disturb it. *National Society of Professional Engineers,* 435 U.S. at 698, 98 S.Ct. at 1368.[6]

Finally, we reject the AMA's hint ("argument" seems too generous when the AMA's claim comprises but one paragraph of a 77–page brief, *Max M. v. New Trier High School District No. 203,* 859 F.2d 1297, 1300 (7th Cir.1988)) that the district court's order somehow infringes on the AMA's First Amendment rights. We think the injunction as written is sufficiently tailored to avoid constitutional objection. As the Supreme Court has stated:

> [w]hile the resulting order may curtail the exercise of liberties that the [defendants] might enjoy, that is a necessary and, in cases such as this, unavoidable consequence of the violation.... The First Amendment does not 'make it ... impossible ever to enforce laws against agreements in restraint of trade....' *Giboney v. Empire Storage and Ice Co.,* 336 U.S. 490, 502 [69 S.Ct. 684, 691, 93 L.Ed. 834 (1949) ]. In fashioning a remedy, the District Court may, of course, consider the fact that its injunction may impinge upon rights that would otherwise be constitutionally protected, but those protections do not prevent it from remedying the antitrust violations.

*National Society of Professional Engineers,* 435 U.S. at 697–98, 98 S.Ct. at 1368–69. That the injunction requires the AMA to publicize and mail copies of the order to AMA members, among other things, does not render it unconstitutional. The district court's form of injunction and method of ensuring its publication (and thus its efficacy) was a reasonable attempt at eliminating the consequences of the AMA's lengthy, systematic, successful, and unlawful boycott.

## IV.

### *Plaintiffs' Cross–Appeal*

Plaintiffs filed a cross-appeal challenging the judgments for defendants JCAH and ACP. With respect to JCAH, plaintiffs advance two separate theories of liability. First, they allege that JCAH unlawfully

---

**6.** For the same reason, we do not view the district court's injunction as improperly awarding classwide relief where no class was certified.

The AMA's argument in this regard is just a rephrasing of its argument that the injunction is overbroad.

conspired with the AMA and participated in the AMA's boycott of chiropractors. Second, plaintiffs contend that JCAH, as a membership trade association, acted as a conspiracy each time it promulgated industry standards, and thus violated the antitrust laws in its own right. As to the latter theory of liability, plaintiffs assert that they raised it before the trial court, but that the court never ruled on it. JCAH does not contest this summarization of the events in the district court, and we accept it. Plaintiffs' theory against ACP also is two-fold. They first contend that ACP also participated in the AMA's boycott. Second, they charge that ACP is a member of the "continuing conspiracy that is the JCAH." None of plaintiffs' arguments are persuasive.

Following the first trial in this case, JCAH and ACP appealed the denial of their motions for a directed verdict. We affirmed the denial of those motions, explaining that the evidence was sufficient to permit, but not require, a jury (or, as it turned out, the trial court) to conclude that the defendants JCAH and ACP knew that concerted action in a scheme was contemplated and invited, and that both acquiesced and participated in that scheme. *Wilk I*, 719 F.2d at 233. This would have permitted a finding of liability, we reasoned, citing *Theatre Enterprises Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 540, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954); *Interstate Circuit Inc. v. United States*, 306 U.S. 208, 226–27, 59 S.Ct. 467, 474–75, 83 L.Ed. 610 (1939).

Following *Wilk I*, the Supreme Court decided two cases, which the district court in the second trial held clarified and limited the cases relied upon in *Wilk I*. These cases were *Monsanto v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In *Monsanto*, the Court held that,

to survive a summary judgment motion, an antitrust plaintiff needed evidence tending to "exclude the possibility" that the alleged conspirators were acting independently, *id.* 465 U.S. at 764, 104 S.Ct. at 1471, and that the plaintiff must present "direct or circumstantial evidence that reasonably tends to prove" that the alleged conspirators " 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' " *Id.*, quoting *Edward J. Sweeney & Sons v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). *Matsushita* reaffirmed that holding. There, the Court stated "conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support an inference of conspiracy." 475 U.S. at 597 n. 21, 106 S.Ct. at 1361 n. 21.

Applying *Monsanto* and *Matsushita*, the district court analyzed plaintiffs' claims to determine whether or not each defendant's own conduct showed membership in the AMA's conspiracy. 671 F.Supp. at 1489.[7] We review each defendant separately. Again, because the district court adequately set forth the facts, we only summarize them here.

### A. *JCAH*

JCAH is a not-for-profit corporation established for the purpose of setting standards and conducting health care accreditation programs in conjunction with those standards. JCAH's members include the AMA, ACP, the American College of Surgeons, the American Hospital Association, and the American Dental Association. It is governed by a board of commissioners. Twenty-one commissioners are appointed by the various members, who then appoint one public commissioner. The AMA is one of JCAH's two "dominant members" (this characterization being based solely on the number of commissioners each member is allotted).

---

7. The district court also held that even if JCAH were acting independently of the AMA boycott, its members (e.g., the AMA) were not responsible for the actions of JCAH. 671 F.Supp. at 1491–92. On appeal, plaintiffs tell us that this was unnecessary, and actually confused their asserted theory that JCAH was an unlawful conspiracy in its own right. Thus, we do not pass on the propriety of the district court's ruling in this regard.

Participation by hospitals in the JCAH's accreditation program was voluntary. Nevertheless, accreditation was important to a hospital and "loss of accreditation would be devastating." *Id.* at 1490. Since before 1958, JCAH had standards providing that hospital medical staffs were to be limited to fully licensed physicians (this was liberalized in 1970 to include dentists). *Id.*

In 1964, JCAH's director stated, in a national newsletter, that JCAH viewed chiropractors as cultists, and that hospitals that encouraged such cultists to use their facilities in any way would "very probably be severely criticized and lose [their] accreditation." Despite the similarity of this statement to later AMA efforts, the district court found there was no direct evidence that JCAH was acting in concert with the AMA with regard to this statement or its distribution; thus, it concluded this action was independent.

In 1970, JCAH completed a revision of its standards and published an accreditation manual for hospitals. The manual included "Standard X" (which was drafted by the AMA). Standard X provided that the governing board of each hospital had to assure that medical staff members practiced in an ethical manner. The accreditation manual included a source reference to the AMA's Principles. The district court found that the uncontradicted testimony was that JCAH's board of commissioners never discussed the subject of chiropractic in connection with the accreditation manual. It further found that no chiropractor participated in the accreditation manual's revision process despite the opportunity to participate. *Id.* Based on these findings, the court concluded there was no evidence that JCAH adopted Standard X in connection with chiropractors or to further the AMA's boycott. And while JCAH letters responding to inquiries from hospitals about the role of chiropractors throughout the 1970s did indicate that JCAH would withdraw accreditation of a hospital that had chiropractors on its medical staff or that granted privileges to chiropractors, the district court found these letters were completely consistent with the then-existing accredita-tion standards, and were "not convincing evidence that JCAH had joined the conspiracy against chiropractors." *Id.*

Finally, in 1977, JCAH revised its standards to provide that medical staff membership was to be limited "unless otherwise provided by law" to fully licensed physicians and dentists. References to the AMA's Principles were deleted. So from 1977 on, JCAH's position on chiropractors was that, as limited licensed practitioners, they could be included on medical staffs, if permitted under local law. In 1980, JCAH amended the accreditation manual by deleting Standard X.

Based on these findings, the district court found that all JCAH undertook all action from 1964 through 1980 independently of the AMA boycott. Further support for its conclusion was the fact that JCAH's standards were largely consistent with federal law. *Id.*

Likewise, the district court found that the 1983 revisions of the JCAH standards were independent of the AMA boycott, and that the 1983 revisions were not evidence that the conspiracy against chiropractors continued into 1983. Ultimately, JCAH standards were liberalized regarding admission to medical staffs and allowance of hospital privileges to limited licensed practitioners, including chiropractors. But the standard also required that each accredited hospital's medical staff have an executive committee, the majority of which had to be medical and osteopathic physicians. (This, according to plaintiffs, is evidence that the conspiracy against chiropractors continued into 1983.)

In 1983 the AMA participated in the JCAH standards revision process. That process began in 1982 with recommendations from JCAH staff and the JCAH standard-survey procedures committee. The early recommendations were that each hospital be permitted to decide for itself, under applicable state law, which licensed health care providers would be allowed hospital privileges and medical staff membership. After initially supporting this approach, AMA members and other medical societies

which wanted to ensure medical and osteopathic physician control of the medical staff and patient care in hospitals criticized the AMA. Feeling the heat of their members' criticism, the AMA changed its position and supported revisions which would ensure such control. In late 1983, JCAH adopted new standards which included the mandatory, medical physician-dominated executive committee concept.

According to the district court, the evidence supported the conclusion that JCAH members were acting to ensure that the responsibility for patient care in acute care hospitals remained in the hands of medical and osteopathic physicians, and that this was an appropriate goal for JCAH. Patients in acute care hospitals are generally the very sick or in need of surgery. They are patients who require treatment with drugs or surgery—i.e., treatment by fully licensed physicians (that chiropractors may not perform). This led the court to conclude that "[t]he evidence supports no conclusion other than that patient care in acute care hospitals, and the medical staffs of acute care hospitals, ought to be under the control of fully licensed physicians rather than limited licensed practitioners. I am persuaded that the JCAH members were not acting to prevent chiropractors from being admitted to hospitals or obtaining hospital privileges." 671 F.Supp. at 1493.[8]

Because the court found that JCAH's acts before the 1983 revisions were independent of the AMA boycott, and that the 1983 revisions were not evidence that the conspiracy against chiropractors continued into 1983, it concluded that plaintiffs failed to prove that JCAH was a member of the conspiracy. *Id.* at 1494.

## 1. JCAH as Conspiracy

Plaintiffs' first theory on appeal is that JCAH, as a trade association, "acts as a conspiracy or combination every time it promulgates industry standards [which unreasonably restrain competition]." But a trade association is not, just because it involves collective action by competitors, a "walking conspiracy." *Consolidated Metal Products, Inc.*, 846 F.2d at 293–94. There is no evidence that JCAH's accreditation program "is merely a ploy to obscure a conspiracy" against chiropractors. *Id.* at 294. And plaintiffs' arguments for a separate antitrust violation with respect to JCAH standing alone are unpersuasive.

The most serious problem with plaintiffs' theory is that they did not prove any actual or threatened antitrust injury directly traceable to the alleged antitrust violation which would be redressed by the issuance of an injunction against JCAH. *See Cargill, Inc. v. Monfort of Colorado Inc.*, 479 U.S. at 122, 107 S.Ct. at 495. Thus, even if this particular claim was not expressly addressed by the district court, plaintiffs' claim still must fail. In support of their contention that they suffered actual injury, plaintiffs offer "evidence" of examples of when each plaintiff was denied privileges or medical staff membership at certain hospitals. But after thoroughly reviewing the record, we conclude these examples do not show any connection to JCAH or its Standard X. (Jt.App. 13–14; 15–17; 89–100; 181; 182–87; 190–91; 380–81; 420; 672–81; 773–74; 851; and 934–35.) Because we find no antitrust injury occurred as a result of the 1970 Standard X, we necessarily conclude that there was no continuing JCAH boycott as a result of the revisions in 1983.[9]

---

8. The court went on to observe that under current JCAH standards, hospitals could grant chiropractors medical staff membership, clinical privileges, admission privileges, and access to diagnostic services without fearing loss of JCAH accreditation. Authority for making individual medical staff appointments now rests with the individual hospital's governing board.

9. Plaintiffs claim, for the first time in their reply brief, that the 1983 standards themselves violate the antitrust laws. The district court,

however, stated that plaintiffs were not claiming that the 1983 JCAH standards violated the antitrust laws. 671 F.Supp. at 1492. Whether they did or did not raise the issue in the district court, there is no question that the plaintiffs' initial appellate brief did not raise this issue. Rather, plaintiffs argued that "The JCAH 1983 Revisions Continue[d] The Boycott." In this regard they stated, "only one conclusion is possible: the JCAH M.D. domination standard *perpetuates* the boycott" (emphasis added). We

## 2. JCAH as Member of the AMA Boycott

Plaintiffs' second theory of antitrust liability against JCAH contends that JCAH was a member of the AMA's boycott. In this regard, plaintiffs contend that JCAH knew the AMA boycott was contemplated and that it acquiesced and participated in that scheme. As stated above, the *Monsanto* and *Matsushita* cases hold that to establish liability under this theory, there must be evidence that at least tends to exclude the possibility that the alleged conspirators were acting independently, rather than pursuant to " 'conscious commitment to a common scheme designed to achieve an unlawful objective'," *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471, quoting *Edward J. Sweeney & Sons*, 637 F.2d at 111. Plaintiffs, however, argue that *Monsanto* and *Matsushita* are inapplicable to this case because here we are dealing with a horizontal combination, and because there is "direct evidence" of a conspiracy in this case. We agree with the district court, however, that this case should be governed under the standards set forth in *Monsanto* and *Matsushita*. We have stated before, "[t]he actual label placed on the conspiracy is a 'pedantic distinction,' as the Monsanto standard applies regardless of which label is attached." *Valley II*, 822 F.2d at 660 n. 5. And plaintiffs point to no "direct evidence" of the conspiracy.

At best, plaintiffs make only a perfunctory argument that JCAH knowingly adhered to and participated in the AMA's unlawful boycott. Nowhere do they attempt to show just how the district court made erroneous findings of fact. Rather, they point to the fact that JCAH adopted Standard X (after being manipulated by the AMA in doing so) to establish JCAH's participation in the boycott. But the district court found that JCAH's board of commissioners never discussed the subject of chiropractic, and that the subject was never raised in connection with the 1970 revisions of the accreditation manual. It also found that no chiropractor participated in the revision process despite having an "extensive opportunity" to do so. Thus, the court held "[t]here was no evidence that JCAH adopted Standard X in connection with chiropractors or in furtherance of the AMA boycott." 671 F.Supp. at 1490. Plaintiffs' urgings to the contrary are nothing but a bald invitation to substitute our judgment for the district court's. Consistent with our prior treatment of this issue in *Wilk I*, 719 F.2d at 233, the evidence may have been sufficient to find that JCAH participated in the conspiracy, but it did not require such a finding. The district court was entirely within its right to find no conspiracy between JCAH and the AMA.

As evidence of JCAH's participation in the conspiracy, plaintiffs also point to the district court's finding that JCAH cooperated with the AMA in connection with the distribution of an article titled "The Right and Duty of Hospitals to Exclude Chiropractors from Hospitals." Apparently, they believe this carries the day in establishing JCAH's participation in the boycott. We disagree. As the district court found, the JCAH's use of the cited article was in connection with inquiries from hospitals about the role of chiropractors in hospitals. 671 F.Supp. at 1490. The court also found that the JCAH letters were "completely consistent with the then-existing accreditation standards." *Id.* We thus agree with the district court that this was "not convincing evidence" that JCAH participated or joined in the AMA's conspiracy against chiropractors. *Id. Cf. Monsanto*, 465 U.S. at 762, 104 S.Ct. at 1470 (communication about prices and marketing strategy does not alone show that distributors are not making independent pricing decisions).[10]

---

think it plain that plaintiffs made their claim that the 1983 revisions themselves were unlawful for the first time on reply. We thus will not address the argument. *See Gold v. Wolpert*, 876 F.2d 1327, 1331 n. 6 (7th Cir.1989).

**10.** Plaintiffs make one additional claim. This case, they tell us, fits neatly within the frame-

work of *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). They assert that because the trial court found the AMA manipulated the JCAH and caused it to adopt Standard X (as well as circulating the AMA's "Right and Duty of Hospitals to Exclude Chiropractors"), that JCAH was liable because it al-

## B. *ACP*

The analysis and outcome would be much the same for ACP as for JCAH, at least so far as its alleged participation in the AMA's boycott is concerned. ACP's alleged membership or participation in the AMA's unlawful boycott, for example, is also judged under the *Matsushita* and *Monsanto* standards. Here, though, we must digress briefly to address a problem with plaintiffs' argument. Their claims in this respect seem at best to be confused. In their opening brief, they refer to the ACP's participation in "the boycott," and argue that the district court's finding that the ACP did not participate in any boycott of chiropractors is clearly erroneous. The district court's findings in this regard concern whether or not ACP was a member of or participated in the AMA's conspiracy. 671 F.Supp. at 1471, 1489, 1494–96. It is obvious from the district court's opinion, and from plaintiffs' opening brief, that "the boycott" referred to is the *AMA's* unlawful boycott. But in their reply brief, plaintiffs say it is "irrelevant" whether or not ACP conspired with the AMA. In other words, they are arguing that the district court's finding that ACP was not a member of the AMA's boycott, 671 F.Supp. at 1494–96, is not at issue on this appeal. We will take them at their word; that issue is now foreclosed against them.

Apparently, then, plaintiffs are claiming, as they did with JCAH, that the ACP as a membership association engaged in concerted activity through various acts. That is, the ACP is liable under § 1 of the Sherman Act in its own right. Plaintiffs also present a second theory of liability: that the ACP, as a member of the JCAH, is liable for the unlawful acts of that organization because it knowingly participated in and ratified those acts.

### 1. ACP as a Conspiracy

▇▇▇ There is no evidence that ACP itself engaged in an unlawful boycott of chiropractors. Plaintiffs point to the ACP's bylaws which provided that the purpose of the ACP included "preserving the history and perpetuating the best tradition of medicine and medical ethics." Because of the fact that many of the ACP's members were also AMA members, plaintiffs argue that this veiled reference to ethics somehow furthered an ACP boycott. But the ACP never adopted the AMA's Principles (including former Principle 3), and never required its members to subscribe to those principles. 671 F.Supp. at 1494. Also, the ACP never had a code of ethics. In 1984 it published the American College of Physicians Ethics Manual. But this was not a code or set of regulations. Rather, it was an effort to address major contemporary issues confronting all physicians and merely attempted to stimulate debate on medical ethics. The manual stated nothing about chiropractic or about what remedies are or are not "scientific." Indeed, as the district court found, the manual appears to leave the individual physician free to make his own judgment as to the kinds of treatment he should participate in and in his relations with other licensed health practitioners. 671 F.Supp. at 1494.

The plaintiffs rely on two additional documents to establish an ACP boycott. The first grew out of a September 1978 meeting of the ACP's board of governors. (The board of governors was not the ACP's policymaking body.) The Board at that meeting accepted a report by an ad hoc committee appointed to suggest what might be done to promote the ACP's policy toward chiropractic. According to the district court, the minutes of that meeting reflect that:

> The committee agreed unanimously that ACP should be concerned about and oppose any action which would include chiropractic among the scientifically-based modes of medical care and which would

lowed itself to be manipulated and used as a mechanism through which the AMA enforced its anti-competitive scheme. Plaintiffs cite *Hydrolevel* in the portion of their argument dealing with JCAH's alleged knowing adherence and participation in the AMA's boycott. But *Hydro-* *level* does not address the conscious parallelism issue. *Hydrolevel* speaks of an association's liability in its own right, not as a member of another's unlawful conspiracy. We thus believe *Hydrolevel* is inapplicable to this case.

give chiropractors direct access to the diagnostic facilities of hospitals.

671 F.Supp. at 1495. Plaintiffs also point to a resolution adopted by the board of governors which provided, among other things:

(2) the governors should remain alert to efforts of chiropractors to gain access to radiographic and clinical laboratory diagnostic facilities in their regions and keep ACP headquarters informed of such developments;

\* \* \* \* \* \*

(8) the governors should alert colleagues in other disciplines to the efforts of chiropractors to gain access to radiographic and clinical pathology diagnostic facilities; and

(9) the governors and the college members in their regions should discuss these matters with their county and state medical societies and with their representatives to the house of delegates of the AMA.

671 F.Supp. at 1495-96.

Although the district court found that many parts of the resolution related to matters protected under the Noerr–Pennington doctrine, not everything included was protected. (This is not at issue on appeal.) What is important is that the district court found that the resolution contained no call for the participation of ACP or its members in the AMA's boycott against chiropractors, "or [in the] ACP's own boycott." 671 F.Supp. at 1496. Continuing, the court explained "[m]oreover,

the resolution was never implemented ... and there is no evidence that ACP members were called upon to cooperate in effectuating ACP's 'policy' on chiropractic." *Id.* Plaintiffs do not show how the district court's findings are clearly erroneous; rather, they just interpret the document differently. It is well established by now, however, that we do not substitute our view of the facts for the district court's on appeal. After reviewing the evidence, we are not left with the "definite and firm conviction" that the district court made a mistake in interpreting this evidence. *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

Plaintiffs also point to a joint document in which the ACP participated, titled "Status Report on Chiropractic Lawsuits" to establish an ACP conspiracy. The report was distributed to ACP members. It does contain an admission that Principle 3 forbade association with chiropractors. But, as the district court explained, this admission was irrelevant as to ACP which had not adopted the AMA's Principles, and which did not have a medical ethic similar to Principle 3. We agree. Again, plaintiffs just offer their different interpretation of the document, which has never been enough to carry the day when reviewing a district court's factual determinations. We see no error.[11]

### 2. ACP Participation in JCAH's Conspiracy

Finally, plaintiffs contend that ACP is a member of "the continuing conspiracy that

---

**11.** Plaintiffs also argue that the district court erroneously "excluded evidence [which] proves ACP's knowing intent to exclude chiropractors." (Plaintiff's reply br. at 23.) What plaintiffs are getting at is that certain evidence was held by the district court to be protected under the Noerr–Pennington doctrine. The first involved a letter written to a governmental agency (the National Institute of Neurological Diseases and Strokes (NINDS)) in connection with a government project (the study of chiropractic). Plaintiffs claim this was not protected under the Noerr–Pennington doctrine because blind copies were sent to the AMA's Committee on Quackery and other medical societies. They ignore the fact, however, that the district court made an alternative holding with respect to this letter. It stated that even if the letter was not protected,

it was obvious that it expressed only the author's own opinion as to what action the ACP's board of regents (its policymaking body) might take in the future, and that it was not the act of the ACP endorsing the AMA chiropractic policy statement. The court also found there was no evidence that ACP had knowledge of the activities of the Committee on Quackery. Thus, we do not need to address whether or not this document was protected under the Noerr–Pennington doctrine, as the alternative ground is both sound and unchallenged.

Plaintiffs make two perfunctory and undeveloped contentions with regard to "exclusion" of "boycott activity." But neither of these amounts to an "argument" under Fed.R.App.P. 28(a)(4). Thus, we will consider neither.

is the JCAH." But since we have held JCAH did not violate the antitrust laws, ACP could not be liable for participating in JCAH's acts. Thus, plaintiffs' theory that ACP is liable for participating in JCAH's conspiracy fails.

## V.

### *Conclusion*

We affirm the district court's finding that the AMA violated § 1 of the Sherman Act by conducting an illegal boycott of chiropractors, and the district court's decision to grant an injunction against the AMA. In finding liability, the court did not improperly rely on evidence of conduct protected by the Noerr–Pennington doctrine. The district court's factual findings supported its finding that the AMA's boycott was illegal under the rule of reason, and those findings were not clearly erroneous. The district court also did not clearly err in finding that the AMA did not meet its burden of proving its patient care defense, and in finding that the AMA's boycott caused the plaintiffs past injury and the threat of future injury. The court did not abuse its discretion in imposing an injunction on the AMA. The court's factual findings supported its exercise of equitable discretion, and the injunction was not overbroad.

We also affirm the district court's findings that JCAH and ACP did not participate in the AMA's boycott, or in any other way violate § 1 in their activities concerning chiropractors. The plaintiffs' theory that JCAH itself conspired by setting standards fails because the plaintiffs failed to prove that the JCAH's actions caused them any actual or threatened injury. The court's finding that JCAH did not participate in the AMA's conspiracy was not clearly erroneous. The plaintiffs have waived any contention that ACP participated in the AMA's conspiracy by claiming that any such participation was "irrelevant." The district court did not clearly err by finding that ACP did not conduct its own conspiracy, and since JCAH did not violate § 1, ACP could not be liable for participating in JCAH's actions.

The district court's decision is AFFIRMED.