**J. Harrison HENDERSON, III, Plaintiff,**

**v.**

**The TIMES MIRROR COMPANY, the Sporting News Publishing Company, Darrel ("Mouse") Davis, and Howard Balzer, Defendants.**

**Civ. A. No. 86–C–9.**

United States District Court, D. Colorado.

Sept. 16, 1987.

Katherine Campbell, Polidori, Rasmussen, Gerome & Jacobson, Lakewood, Colo., for J. Harrison Henderson, III.

Robert M. Steiert, Miller & Leher, Littleton, Colo., for Darrel Davis.

George B. Curtis, Gibson, Dunn & Crutcher, Denver, Colo., for Times Mirror Co., Sporting News Pub. Co. and Howard Balzer.

## ORDER

CARRIGAN, District Judge.

This is the case of the mouse that roared invective. One of the defendants, Darrel "Mouse" Davis, in a statement to newspaper reporters, called the plaintiff a "sleaze-bag agent" who "slimed up from the bayou...." Plaintiff, J. Harrison Henderson III, is an agent for professional football players. By this lawsuit, Henderson takes exception to Davis' comments and seeks damages. Also named as defendants are a news editor and two newspaper companies whose papers published Davis' remarks. Jurisdiction is founded on diversity under 28 U.S.C. § 1332 and is not disputed. Defendants have moved for dismissal under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. Briefs have been filed, oral argument has been heard and the motions are ripe for decision.

Plaintiff's complaint asserts claims of: (1) libel and slander per se and per quod; (2) disparagement; and (3) intentional interference with contractual relations. Specifically, Henderson alleges that in January 1985 the Denver Gold professional football team wanted to hire, and negotiated directly with, a quarterback named Raphel Cherry. During the course of the negotiations, Cherry hired the plaintiff as his agent to assist in negotiations. After the plaintiff commenced representing Cherry, negotiations with the Gold collapsed. Thereafter "Mouse" Davis, as head coach of the Gold, told news reporters that the Gold had offered Cherry more than $100,000 before Henderson became his agent and upped the asking price to $200,000, thus terminating the negotiations. Davis admittedly referred to the plaintiff as a "sleazebag" who kind of "slimed up from the bayou."

Plaintiffs' complaint further alleges that on or about January 8, 1985, the defendant Times Mirror Company, in its paper, *The Los Angeles Times*, published an article quoting Davis' description of the plaintiff as "a sleaze-bag agent" who "kind of slimed up from the bayou" together with an additional statement by Davis that the

Denver Gold "gave [Cherry] a better offer than anybody else."

As to *The Sporting News Publishing Company*, the plaintiff contends that its associate news editor, the defendant Howard Balzer, and its paper, *The Sporting News*, published an article that quoted Davis' abusive description of the plaintiff, and further stating that "[t]he Gold offered Cherry more than $100,000.00, but Henderson upped the asking price to $200,-000.00."

As stated, the defendants Times Mirror Company, Sporting News Publishing Company and Balzer have moved to dismiss the plaintiff's amended complaint pursuant to Fed.R.Civ.P. 12(b)(6), contending:

(1) that Davis' comments were merely opinion and, therefore, their republication of those remarks is not actionable as defamation, and

(2) that the remarks, as opinion, are protected by the First Amendment.

Defendant Davis has filed a motion in effect adopting his co-defendants' position.

In reviewing the sufficiency of a complaint, when tested by a motion to dismiss, I must accept as true the complaint's allegations, and view them in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The complaint must stand "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

Whether a statement is protected by the First Amendment is a question of law to be determined by the court. *Rinsley v. Brandt*, 700 F.2d 1304, 1309 (10th Cir. 1983). In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court indicated that opinions, as distinguished from facts, are protected by the First Amendment, and, therefore, a claim for defamation cannot be predicated on a mere expression of opinion. *Gertz* stated that "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion

may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Id.* at 339–40, 94 S.Ct. at 3007. Similarly, in *Ollman v. Evans*, 750 F.2d 970, 975 (D.C.Cir. 1984) (en banc), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985), the court stated:

> "*Gertz* elevated to constitutional principle the distinction between fact and opinion, which at common law had formed the basis of the doctrine of fair comment. *Gertz*'s implicit command thus imposes upon both state and federal courts the duty as a matter of constitutional adjudication to distinguish facts from opinions in order to provide opinions with the requisite, absolute First Amendment protection."

*See Lewis v. Time, Inc.*, 710 F.2d 549, 553 (9th Cir.1983) ("[a]n opinion is protected because it cannot, under *Gertz*, be 'false' ").

Long before *Gertz* our forebears recognized the importance of allowing men and women to express their opinions freely. Thomas Jefferson stated:

> "The basis of our government being the opinion of the people, the very first object should be to keep that right; and were it left to me to decide whether we should have a government without newspapers, or newspapers without a government, I should not hesitate a moment to prefer the latter." *Letter to Colonel Edward Carrington* (January 16, 1787).

Similarly, John Stuart Mill observed that "[w]e can never be sure that the opinion we are endeavoring to stifle is a false opinion; and if we were sure, stifling it would be an evil still," J.S. Mill, *On Liberty*, Introduction (1859). And Mark Twain declared "difference of opinion makes horse races." And football games.

This is not to say that our law and literature have been callously indifferent to the very real hurt that may be inflicted by insults or invective pronounced in the form of opinion. As observed by Philip Dormer Stanhope, Earl of Chesterfield, "[a]n injury is much sooner forgotten than an insult." *Letters to His Son* (October 9, 1746). The

question is not whether there may be injury, but whether the law affords a remedy for such an injury. As stated in *Mosely v. Moss,* 6 Gratt 534 (Va.1850), "[w]ords spoken that are merely vituperative, or insulting ... are not regarded by the common law as sufficiently substantial to be treated as injuries calling for redress in damages". Likewise in *Bartow v. Smith,* 149 Ohio St. 301, 78 N.E.2d 735, 737 (1948) the court declared "[i]t is axiomatic that opprobrious epithets, even if malicious, profane and in public, are ordinarily not actionable." Thus, dismissal is proper if Davis' remarks were no more than name-calling or rhetorical hyperbole as distinguished from asserted statements of fact.

In *Gertz,* the Supreme Court stated that "there is no constitutional value in false statements of fact", 418 U.S. at 340, 94 S.Ct. at 3007, and the plaintiff here insists that Davis' comments went beyond opinion and contained assertions of fact. Specifically, the plaintiff contends that "[t]he statements by [Davis] ... gave rise to the inference that [Davis] knew of undisclosed facts about the [p]laintiff", and that "a reader would think that [d]efendant Davis, head coach of the Denver Gold, meant that the [p]laintiff was unethical or incompetent in his capacity as agent for professional football players."

In *Ollman v. Evans, supra,* a plurality of the *en banc* United States Court of Appeals for the District of Columbia Circuit adopted a four-part test to assist in determining whether a statement asserts a fact or merely expresses an opinion. The factors to be considered are: (1) the common usage or meaning of the specific language in the challenged statement; (2) whether the truth or falsity of the statement can be objectively verified; (3) the full context in which the statement was made; and (4) the broader context or setting in which the statement appears. 750 F.2d at 979.

Here, the specific meaning of the allegedly defamatory terms is far from clear. "Sleazebag" apparently has yet to earn a mention in popular dictionaries. "Sleazy" is defined as being "thin or poor in texture." *The Random House College Dictionary,* at 1236 (rev. ed. 1982). To be "sleazy" is "to be contemptibly low or unimportant." *Id.*

In contrast, to "slime" is "[t]o smear or cover with slime" or "[t]o crawl or steal along." *Webster's New International Dictionary,* at 2365 (2d ed. 1950).

■ While it can be agreed generally that the terms "sleazebag" and "slime" do not rank as descriptive words one would prefer to have in letters of recommendation, their meanings in the context of Davis' comments is so imprecise that they cannot be considered as asserting facts. While it may not be a compliment to be called a "sleaze-bag agent," or "sleaze-bag journalist," or "sleaze-bag coach," or whatever kind of sleaze-bag one may happen to be, the mere absence of complimentary affect does not render a statement defamatory.

Nor does the mere description of one's means of locomotion as "sliming" rise to the legal status of slander; for the term is too slippery to be a fact one can grasp and hold up to the lamp of truth in order to test whether the defense of truth applies. As the court stated in *Ollman,* "statements that are 'loosely definable' or variously interpretable' cannot in most contexts support an action for defamation." 750 F.2d at 980. *See Buckley v. Littell,* 539 F.2d 882, 895 (2d Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977) (use of expressions such as "fascist" cannot "be regarded as having been proved to be statements of fact ... because of the tremendous imprecision of the meaning and usage of these terms....").

Lest the plaintiff feel that he or his profession are singled out for less favorable treatment by the law, he is referred to the cases of *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 397 N.Y.S.2d 943, 947, 366 N.E.2d 1299, 1307 (1977), *cert. denied.,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977) (term "incompetent" as applied to a judge held too vague to support a claim of libel); *Cole v. Westinghouse Broadcasting Co.,* 386 Mass. 303, 435 N.E.2d 1021 (1982), *cert. denied,* 459 U.S.

1037, 103 S.Ct. 449, 74 L.Ed.2d 603 (1982) (held that statement that a journalist had engaged in "sloppy and irresponsible reporting" and had poor reporting technique was too "imprecise" to support a defamation action). As re-affirmed in *Bucher v. Roberts*, 198 Colo. 1, 595 P.2d 239, 241 (1979), "Once a court needs to speculate concerning the meaning the statement purports to convey ... we enter the area of opinion as opposed to factual assertion."

The next step under the *Ollman* test is to assess whether the statements are objectively capable of proof or disproof. "The reason for this inquiry is simple: a reader cannot rationally view an unverifiable statement as conveying actual facts." *Id.*, 750 F.2d at 981. Truth is a defense in a defamation action. *See* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts*, at 839 (5th ed. 1984). But whether or not a particular person is a "sleazebag" is not susceptible of proof or disproof because the definition of the term "sleazebag" is not sufficiently settled in English usage. While it seems clear that calling one a "sleaze-bag" confers no honor and that the word is not a term of endearment or approbation, its mere implication of derision does not rise to the level of factual statement. It is difficult to imagine how the defendants could prove that the plaintiff is a "sleazebag," or how the plaintiff could prove that he is not, and therefore the statement is so incapable of factual proof or disproof that it cannot be defamatory in a system of law where truth is a defense.[1] Obviously a jury cannot decide whether words are true or false absent clear definitions of what those words mean.

Besides evaluating the precision-indefiniteness and verifiability-unverifiability of a statement at issue, courts should examine the *context* in which the statement occurs. Invariably, readers will be influenced by context, and thus the distinction between fact and opinion can be made only in context. *Ollman*, at 982. The articles in question did not appear in the news columns or even in the regular sports news columns. Rather, they were in sports columns typically devoted to relaying brief accounts of the comments and opinions of sports figures regarding recent events, together with the latest in sports gossip, humorous anecdotes and quotations. The *Los Angeles Times* squib appeared in a section designated "Morning Briefing," and the *Sporting News* article was subtitled "Cherry Picking." Additionally, the context of the articles signaled readers to expect a public figure's comments on a current event in sports.

Finally, the *Ollman* test requires examination of the broader context in which the statement was made. There, the court said:

"Besides looking to the immediate context of the alleged defamatory statement, courts should examine, finally, the broader social context into which the statement fits. Some types of writing or speech by custom or convention signal to readers or listeners that what is being read or heard is likely to be opinion, not fact. It is one thing to be assailed as a corrupt public official by a soapbox orator and quite another to be labelled corrupt in a research monograph detailing the causes and cures of corruption in public service." 750 F.2d at 983.

*See Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 286, 94 S.Ct. 2770, 2782, 41 L.Ed.2d 745 (1974) (no action for use of word "traitor" as applied to an employee who crossed picket line because "such exaggerated rhetoric was commonplace in labor disputes").

Here, the context is a recruiting dispute in the rough and rowdy world of professional football. Defendants argue, and the plaintiff does not dispute in his amended complaint or brief, that "[t]he context of the statements themselves clearly apprised the reader that Coach Davis' statements were made in reaction to the frustrating negotiations...." Closely analogous is

---

1. The problem of factual proof is further complicated by the rule that if the defendant's statements are "of public concern," then the plaintiff bears the burden of proving that the statements are false. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986).

*Valentine v. North American Co. for Life and Health Ins.,* 16 Ill.App.3d 277, 305 N.E.2d 746, 749 (1973), *aff'd,* 60 Ill.2d 168, 328 N.E.2d 265 (1974) (where the court reasoned, "The expression 'lousy agent' was in this case evidently a term of abuse evoked by the disappointment felt by the plaintiff's representation of the defendant company, and as name-calling, its use cannot be held actionable").

Likewise in *Curtis Publishing Co. v. Birdsong,* 360 F.2d 344 (5th Cir.1966), where the plaintiff alleged that he was libeled by being called one of "those bastards," the court, disagreed, reasoning:

> "[I]t is perfectly apparent that [the words] were used as mere epithets, as terms of abuse and opprobrium. As such they had no real meaning except to indicate that the individual who used them was under a strong emotional feeling of dislike toward those about whom he used them. Not being intended or understood as statements of fact they are impossible of proof or disproof. Indeed such words of vituperation and abuse reflect more on the character of the user than they do on that of the individual to whom they are intended to refer. It has long been settled that such words are not themselves actionable as libelous." *Id.* at 348.

Similarly, in *Pease v. Telegraph Publishing Co.,* 121 N.H. 62, 426 A.2d 463, 465 (1981), the New Hampshire Supreme Court reversed a jury verdict in favor of a plaintiff who had been called the "journalistic scum of the earth." There the court reasoned that "[e]ven the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered the plaintiff's journalism deplorable ... and not an assertion of fact." Arguably, an etymologist would place the terms "slime" and "sleazebag" in the same league as "scum"; perhaps a bush league rather than a professional league, but nonetheless the same league.

Certainly, the sports world is an environment where the kind of "robust" debate endorsed by the Supreme Court in *New York Times, Inc. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964), has flourished. Even the once fastidious etiquette of Wimbledon has succumbed to the more gross and tawdry vernacular formerly more characteristic of hockey rinks and football stadia. The world of Damon Runyon was not portrayed in the idiom of the church supper.

Moreover, our Anglo-American linguistic heritage has long recognized vigorous and colorful insult as an art form, albeit not always creative. As noted by the court in *Raible v. Newsweek, Inc.,* 341 F.Supp. 804, 808–09 (W.D.Pa.1972), "Americans have been hurling epithets at each other for generations.... Certainly such name calling ... does not always give rise to an action for libel." In 1800, Charles Lamb wrote to Samuel Coleridge: "For God's sake (I never was more serious) don't make me ridiculous any more by terming me gentlehearted in print ... substitute drunken dog, ragged head, seld-shaven, odd-eyed, stuttering, or any other epithet which truly and properly belongs to the gentleman in question." *Letter to Samuel Taylor Coleridge* (August 1800). W.S. Gilbert once declared that "[n]o one can have a higher opinion of him than I have—and I think he is a dirty little beast." And that indomitable master of the language, Winston Churchill, upon bumping into a woman in the street who declaimed, "Sir, you are drunk," replied, "Madam, you are ugly, and the difference between you and me is that in the morning I shall be sober; but you will still be ugly!"

Unfortunately, such creativity in the art of abusive epithet has all but disappeared. It is all too rare today to hear the clear, clean ring of a really original insult. We have become in our opprobrium, as in other areas of life, conformists copying from the deluge of daily drivel from television or from the only occasionally more original print media.

Historically, an insultee had several options for seeking redress in circumstances such as those here presented. For example, he could have challenged the insultor to a duel. Or, following the lead of literature, one in the plaintiff's position might have trapped "Mouse" Davis in a wine cellar. *See* E.A. Poe, *The Cask of Amontillado,* at 1 (1846) ("[t]he thousand injuries

of Fortunato I had borne as best I could, but when he ventured upon insult I vowed revenge"). However, I am bound by the literature of law, and those precedents oblige me to conclude that Davis' utterances, however unfair or inappropriate, were mere opinion rather than assertions of fact and, therefore, the plaintiff's claims for defamation must be dismissed.

Similarly, the plaintiff's claims for business and personal disparagement and intentional interference with contractual relations cannot withstand constitutional scrutiny. The elements of the tort of disparagement are: (1) a false statement; (2) published to a third party; (3) derogatory to the plaintiff's ... business in general or to some element of his personal affairs; (4) through which the defendant intended to cause harm to the plaintiff's pecuniary interest or either recognized or should have recognized that it was likely to do so; (5) malice; and (6) special damages. *Williams v. Burns*, 540 F.Supp. 1243, 1247–48 (D.Colo.1982). *See Restatement (Second) of Torts*, § 623A, 624. However, even if the plaintiff could prove all of these essential elements, he could not prevail as a matter of law because the statements constituted mere expressions of opinion protected by the First Amendment. *See Pring v. Penthouse Int'l.*, 695 F.2d 438, 442 (10th Cir.1982), *cert. denied*, 462 U.S. 1132, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983) (held First Amendment considerations applicable to defamation also apply to torts of "false light" and "outrageous conduct"). Therefore, the plaintiff's claims for disparagement must be dismissed.

Plaintiff also asserts the tort of intentional interference with contractual relations. To prove that claim the plaintiff must demonstrate: (1) the existence of a valid contract between the plaintiff and a third party; (2) knowledge by the defendant of the contract or knowledge of facts that should lead him to inquire regarding existence of the contract; (3) intent by the defendant to induce or cause the third party not to perform; (4) action by the defendant that induces or causes non-performance of the contract; and (5) resulting injury or damages to the plaintiff. *Williams v. Burns*, 540 F.Supp. at 1251.

In his amended complaint, the plaintiff alleges that "the defendants by communication and publication of the slanderous statements ... intentionally induced Cherry to terminate his contract with the plaintiff." However, the court in *Redco Corp. v. CBS, Inc.*, 758 F.2d 970 (3d Cir. 1985), *cert. denied*, 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 107 (1985), held that since the defendants could not be liable for defamation arising out of their statements of opinion, the intentional interference with contractual relations claim was likewise not actionable because there was no basis for finding that their actions were improper. Thus, the plaintiff's claim of intentional interference with contract cannot be predicated on Davis' expression of opinion, and therefore, this claim also must be dismissed.

Accordingly, it is ordered that the defendants' motions are granted and the plaintiff's complaint and action are dismissed without prejudice for failure of the complaint to state a claim for which relief may be granted.