**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 4 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JEFFERSON COUNTY SCHOOL
DISTRICT NO. R-1,

      Plaintiff - Appellant

v.

MOODY'S INVESTOR'S SERVICES,
INC.

      Defendant - Appellee

No. 97-1157

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No.  95-WY-2649-WD)**

---

Alexander Halpern (William Stuart Stuller with him on the briefs), of Caplan and Earnest,
L.L.C., Boulder, Colorado, for Plaintiff - Appellant

Robert M. Callagy, of  Satterlee, Stephens, Burke and Burke, New York, New York
(Jeffrey A. Chase, of Jacobs, Chase, Frick, Kleinkopf, and Kelley, L.L.C., Denver,
Colorado, with him on the brief), for Defendant-Appellee

---

Before  **KELLY**, **HENRY**, Circuit Judges, and **BRETT**, District Judge.[*]

---

**HENRY**, Circuit Judge.

---

    [*]     The Honorable Thomas R. Brett, Senior United States District Judge for the
Northern District of Oklahoma, sitting by designation.

This diversity action arises out of the defendant-appellee Moody's Investor's Services ("Moody's") article evaluating refunding bonds issued by the plaintiff-appellant Jefferson County School District ("the School District") in October 1993. Contending that Moody's evaluation was materially false, the School District asserted claims against Moody's for intentional interference with contract, intentional interference with business relations, and publication of an injurious falsehood. It also sought to amend its complaint to add antitrust claims.

Moody's filed a motion to dismiss or, in the alternative, for summary judgment. Applying Fed. R. Civ. P. 12(b)(6), the district court concluded that the School District had failed to state a claim upon which relief could be granted. It reasoned that Moody's article was protected by the First Amendment because it neither stated nor implied an assertion that was provably false. The court also denied the School District's motion for leave to amend its complaint.

The School District now appeals. For the reasons set forth below, we conclude that the district court properly dismissed the School District's complaint and that it did not abuse its discretion in denying the School District's motion for leave to amend. We therefore affirm the district court's decision.

## I. BACKGROUND

Because we are reviewing the district court's decision to grant Moody's motion to dismiss for failure to state a claim, we accept the allegations of the First Amended Complaint as true. Witt v. Roadway Express, 136 F.3d 1424, 1431 (10th Cir.), cert denied, 119 S.Ct. 188 (1998). We view the record in the light most favorable to the School District. Id.

In 1993, the School District decided to refinance part of its bonded indebtedness by issuing refunding bonds, thereby obtaining the benefit of lower interest rates. Even though it had retained Moody's in the past, the School District selected two other agencies to rate its bonds. As a result, it paid no fee to Moody's and provided Moody's with no information about its current financial condition.

The School District brought the bonds to market on October 20, 1993. Initially, they sold well, and the District received subscriptions for the purchase of substantially all of the issue. However, less than two hours into the sales period, Moody's published an article regarding the bonds in its "Rating News," an electronically distributed information service sent to subscribers and news services. Moody's stated that although it had not been asked to rate the bonds, it intended to assign a rating to the issue subsequent to the sale. Moody's then discussed the bonds and the School District's financial condition, concluding that "[t]he outlook on the district's general obligation debt is negative,

reflecting the district's ongoing financial pressures due in part to the state's past underfunding of the school finance act as well as legal uncertainties and fiscal constraints under Amendment 1."[1] Aplt's App. at 7. Within minutes, "The Dow Jones Capital Market Reports," an electronic publication owned and operated by Dow Jones & Company, issued an electronic communication repeating the Moody's statement about the refunding bonds' "negative outlook."

The School District alleges that Moody's statement was materially false in that it indicated that the School District's financial condition was not creditworthy and conveyed the impression that Moody's assessment was based on current information. The School District further maintains that the most recent financial information that it had sent to Moody's was more than a year old. According to the School District, Moody's published the article in order to retaliate against it for deciding to use other credit rating agencies, and the article had a significant effect on the marketing of the bonds: purchase orders ceased, several buyers canceled prior orders, and the School District was forced to reprice the bonds at a higher interest rate in order to complete the sale, thereby causing it to suffer a net loss of $769,000.[2] The School District's First Amended Complaint names

---

[1] Amendment 1, approved in November 1992, changed the Colorado Constitution by requiring voter approval of certain tax increases. See Aplt's App. at 60-65.

[2] In the view of some commentators, a previous Moody's rating of another bond issue caused a similar loss. See Gregory Husisian, What Standard of Care Should Govern the World's Shortest Editorials?: An Analysis of Bond Rating Agency Liability, 75 Cornell L. Rev. 411, 412 (1990) (discussing analysts' conclusion that Moody's had

Moody's as a defendant and asserts claims under Colorado law for intentional interference with contractual relations, intentional interference with prospective contractual relations, and publication of an injurious falsehood. In response, Moody's filed a motion to dismiss, or in the alternative, for summary judgment. The District objected and then filed a motion for leave to file a second amended complaint adding antitrust claims against Moody's for monopolization and attempted monopolization under section 2 of the Sherman Act, 15 U.S.C. § 2.

The district court treated Moody's motion as a motion to dismiss and granted it. Observing that a statement "of opinion relating to matters of public concern which does not contain a provably false factual connotation" or which "cannot reasonably be interpreted as stating actual facts about an individual" is protected by the First Amendment, Aplt's App. at 345 (quoting Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990)), the court held that Moody's statements about the refunding bonds were not provably false and were therefore immunized from the School District's tort claims by the First Amendment.

The court then turned to the school district's motion to file an amended complaint adding antitrust claims against Moody's. In light of its conclusion regarding the District's state law tort claims, the court said, " the core issue . . . is whether constitutionally

---

"goofed" and that its mistake had dropped "a bomb" on the investment market by lowering a rating on a bond issue).

protected expression of opinion, without more, is immune from Sherman Act liability."

Aplt's App at 347. The court concluded the First Amendment afforded Moody's opinion

the same protection from the federal antitrust claims as it did from the state tort claims.

Reasoning that the proposed amendment of the complaint would be futile, the court

denied the School District's motion for leave to file a second amended complaint.


## II. DISCUSSION

On appeal, the School District argues that the district court erred in dismissing its

claim for publication of an injurious falsehood, challenging the conclusion that Moody's

evaluation of the refunding bonds constituted a protected expression of opinion.

Alternatively, the School District argues that, even if Moody's evaluation of the bonds is

constitutionally protected, the allegations of its complaint address Moody's conduct in

addition to its speech. As a result, it contends, its claims for intentional interference with

contractual and business relations should not have been dismissed. Finally, the School

District maintains, the district court erred in denying its motion for leave to amend its

complaint to add antitrust claims against Moody's. As with the intentional interference

claims, the School District alleges that its antitrust claims are directed at Moody's

conduct and not solely at its speech.

In addressing the School District's arguments, we begin with an overview of the

First Amendment's protection of statements of opinion from defamation claims. Then,

-6-

we apply those general First Amendment principles to the School District's claim for publication of an injurious falsehood. Finally, we turn to the alternative arguments that, even if Moody's evaluation of the refunding bonds is constitutionally protected, the School District should still be allowed to proceed on its intentional interference and antitrust claims.

## A. First Amendment Protection of Expressions of Opinion

The law of defamation and the First Amendment serve competing social values. The former protects an individual's interest in his or her good name, providing a cause of action for damage to reputation caused by false statements. See Milkovich v. Lorain Journal Co., 497 U.S. 1, 11-14 (1990) (summarizing the history of defamation law). The latter protects freedom of expression and "was fashioned to assure unfettered interchange of ideas for the bringing about political and social changes desired by the people." New York Times v. Sullivan, 376 U. S, 254, 269 (1964)).

Beginning with Justice Brennan's landmark opinion in Sullivan , the Supreme Court has held that the First Amendment's guarantee of freedom of expression limits the scope of state defamation laws. Milkovich, 497 U. S. at 14. Thus, the First Amendment prohibits public officials and public figures from recovering damages for false and defamatory statements unless they demonstrate that the statement was made with actual malice. See id. (discussing Sullivan and Curtis Publishing Co. v. Butts, 388 U.S. 130 (1967)). Additionally, in defamation actions against media defendants, the First

Amendment requires that a plaintiff bear the burden of proving that the statement in question was false and that the defendant had the requisite state of mind. See id. (discussing Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 777 (1986)).

In Milkovich, the case applied by the district court in dismissing the School District's defamation claim, the Supreme Court addressed another important limitation on the scope of defamation laws. "[A]t least in situations . . . where a media defendant is involved," the Court concluded, "a statement on matters of public concern must be provable as false before there can be liability under state defamation law." Milkovich, 497 U.S. at 19-20. Thus, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." Id. at 20.

Importantly, in reaching this conclusion, the Court rejected the argument that the First Amendment creates "a wholesale defamation exemption for anything that might be labeled 'opinion.'" Milkovich, 497 U.S. at 18. It reasoned that expressions of opinion may often imply an assertion of objective fact:

> If a speaker says, "In my opinion, John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if he states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as such damage to reputation as the statement, "Jones is a liar."

Milkovich, 497 U.S. at 18-19.

The Court then considered the allegedly defamatory statement in the case before it–a newspaper article declaring that anyone who had attended a wrestling meet "knows in his heart" that a coach had lied in testifying about the meet at a subsequent hearing. Id. at 5. It addressed two related questions: (1) whether a reasonable factfinder could conclude that the article implied an assertion that the plaintiff had committed perjury; and (2) whether the connotation that the plaintiff committed perjury was sufficiently factual to be susceptible of being proved true or false. Id. at 21.

The Court answered both questions affirmatively. First, it concluded that the article did not employ "the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining that petitioner committed the crime of perjury." Id. at 21. Second, it concluded that a determination of whether the coach committed perjury could made by considering objective evidence (i.e. the transcripts of the plaintiff coach's testimony at various proceedings). Accordingly, it concluded that the statement about the coach's testimony was not an expression of opinion protected by the First Amendment.

Milkovich distinguishes between what one scholar has labeled evaluative and deductive opinion. See Kathryn Dix Sowle, A Matter of Opinion: Milkovich Four Years Later, 3 Wm. & Mary Bill of Rights Journal 467, 474 (1994). According to Professor Sowle, evaluative opinions are those that are not provably false, and a writer or speaker

-9-

may not be held liable on a defamation claim for expressing them.  In contrast, deductive opinions are those that state or imply assertions that may be proven false; the First Amendment does not immunize them from defamation claims.  See id.

Although the distinction between these two kinds of opinions is sometime difficult to draw, consideration of the following factors has proven useful: (1) the phrasing of the allegedly defamatory statement; (2) the context in which the statement appears; (3) the medium through which it is disseminated; and (4) the circumstances surrounding its publication.  See NBC Subsidiary (KCNC-TV), Inc. v. The Living Will Center, 879 P.2d 6, 11 (Colo. 1994) (en banc). A review of decisions applying Milkovich illustrates how courts have applied these factors in determining whether allegedly defamatory statements constitute protected expressions of opinion.

In some instances, allegedly defamatory statements have been deemed too indefinite to be proven true or false.   For example, in Biospherics, Inc. v. Forbes, Inc., 151 F.3d 180, 184-85 (4th Cir. 1998), the Fourth Circuit  concluding that a magazine article's statement that optimistic projections about a company's stock were based on "hype and hope" represented the kind of irreverent and indefinite language that indicated that the writer was not stating actual facts.  Similarly,  Keohane v. Stewart, 882 P.2d 1293, 1300-01 (Colo. 1994) (en banc), the Colorado Supreme Court concluded that letters to the editor accusing a trial judge of conspiring to  "let off" the defendant could not be reasonably interpreted as stating actual facts because the letters were replete with

speculative and hyperbolic language and because the context in which they appeared indicated that the writer was stating his opinion.

Other statements have been found to be protected by the First Amendment because their underlying factual premises have been fully disclosed. See, e.g., Biospherics, 151 F.3d at 185-86 (concluding that a magazine article's statements that investors "would sour" on a particular company and that "the few independent analysts who follow the company think its stock is worth $2 on current business" were protected by the First Amendment because the article disclosed the basis for its conclusions); Moldea v. New York Times, 22 F.3d 310, 317 (D.C. Cir. 1994) (en banc) (holding that a statement in a book review that the author had engaged in "sloppy journalism" was protected by the First Amendment because the statement was "supported by revealed premises that we cannot hold to be false in the context of a book review"); Living Will Center, 879 P.2d at 11-12 (Colo. 1994) (en banc) (concluding that a news broadcast that referred to the marketing of a living will package as a "scam" was protected expression of opinion because the facts on which the broadcaster based his assessment were disclosed in the broadcast and there was no hint that the assessment was based on undisclosed information).

Finally, in other instances, courts have concluded that, due to the subject matter involved, there is simply no objective evidence that could prove that an allegedly defamatory statement was false. See, e.g, Living Will Center, 879 P.2d at 13-14

(concluding that the statement that a product was not worth the price was not verifiable because "[t]he worth of a given service or product is an inherently subjective measure which turns on myriad considerations and necessarily subjective economic, aesthetic, and personal judgments"); James v. San Jose Mercury News, Inc., 20 Cal. Rptr. 2d 890, 898 (Ct. App. 1993) (concluding that the statement "when the legal community turns on kids, it doubles their trauma" was protected under Milkovich because it was not verifiable and asking, rhetorically, "When does 'the legal community' 'turn on' 'kids'? What is 'trauma' in this context, and how can its increments be measured?").

In contrast to these decisions, courts have also applied Milkovich to conclude that certain statements, even though couched as expressions of opinion, are provably false and therefore are not protected from defamation claims by the First Amendment. For example, the Ninth Circuit has concluded that a statement in a broadcast that a product "didn't work" could be reasonably interpreted to refer to the performance of specific functions, a matter that could be assessed by evaluating objective evidence. Unelko Corp. v. Rooney, 912 F.2d 1049, 1053-55 (9th Cir. 1990).

B. Moody's Motion to Dismiss the School District's Claim for Publication of an Injurious Falsehood

In this case, the district court began its analysis of Moody's article by considering the phrase "negative outlook." Applying Milkovich, it reasoned that, in the context of the entire article, that phrase did not contain a provably false factual connotation. Although the court acknowledged that the reference to the District's "ongoing financial pressures"

-12-

might be interpreted as stating actual facts, it said that the District's complaint did not allege that the discussion of these financial pressures was materially false. The court rejected the District's argument that the article implied the existence of undisclosed facts.

In challenging the district court's ruling in this appeal, the School District focuses on the statement in Moody's article that its negative outlook was "due in part" to underfunding of the School Finance Act and Amendment 1. According to the School District, that statement implies that there were other "ongoing financial pressures" that engendered the negative outlook to which Moody's article refers. It points to the allegation in its First Amended Complaint that Moody's article "state[d], imp[ied], and convey[ed] the impression that the School District's financial condition was not credit-worthy and that this statement was based on current information concerning the School District and an analysis sufficient to support that conclusion." Aplt's App. at 8. It contends that this implied assertion is provably false and that, as a result, Moody's article is not a protected statement of opinion under Milkovich. Importantly, the School District acknowledges that it has not challenged the accuracy of the particular factual assertions that are expressly set forth in Moody's article–that Colorado Amendment I and the underfunding of the School Finance Act caused financial pressures on the School District.

We review de novo the district court's dismissal of the School District's complaint, applying the same standard as the district court under Fed. R. Civ. P. 12(b)(6). Witt v. Roadway Express, 136 F.3d 1424, 1431 (10th Cir.), cert. denied, 119 S. Ct. 188

-13-

(1998).   As we have noted, we accept as true all well-pleaded facts and view those facts in the light most favorable to the nonmoving party.  See id.  The district court's dismissal may be upheld only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Gaines-Tabb v. ICI Explosives, USA, Inc., 160 F.3d 613, 619 (10th Cir. 1998), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).   Applying this standard, we conclude that the sufficiency of the School District's allegations may be assessed by considering the first of line of inquiry identified in Milkovich:   whether a reasonable factfinder could conclude that Moody's article implied a false assertion of fact about the School District's financial condition.

We begin by examining the allegedly false statements that the School District maintains were implied by the Moody's article.  The first of these statements–that the School District was not creditworthy--is no more specific than Moody's statement about the refunding bonds' "negative outlook."  Like the statement of a product's value, a statement regarding the creditworthiness of a bond issuer could well depend on a myriad of factors, many of them not  provably true or false.  Cf.  Living Will Center, 879 P.2d at 13-14 (discussing the variety of factors involved in assessing a product's value and concluding, as a result, that statements about the products value were not provably false under Milkovich).   For example, one evaluator of the bonds might point to legal developments like those identified by Moody's in concluding that the issuer was not creditworthy.  Another evaluator might point to increasing property values in making a

more optimistic assessment. The difference in the evaluators' assessments of the bonds could result from differing views about the relative weight to be assigned to those factors or from other philosophical or theoretical disagreements rather than from one evaluator's reliance on inaccurate information. We therefore conclude that, in light of its failure to identify a more specific statement, the School District has failed to demonstrate that Moody's implied statement about its creditworthiness is provably false.

Because the alleged statement about a lack of creditworthiness is so vague, the School District's interpretation of Moody's article would be plausible only if it could establish that the article implied some other specific (but as yet unidentified) false assertions about the School District's financial condition. Although the School District maintains that the case should be allowed to proceed because it may be able to identify such statements, the article's use of the phrase "ongoing financial pressures" undermines that argument. The range of factors that could cause "ongoing financial pressures" is vast, ranging from constitutional and statutory changes, court decisions, property values, inflation, and labor costs to many other factors too numerous to catalogue. In order for the School District to prove that Moody's article implied an assertion about the factors causing the District's "ongoing financial pressures," it would first need to identify one or several of these many possible factors. It would then need to demonstrate that a reasonable reader of Moody's Rating News could discern these assertions from the general references to the refunding bonds' "negative outlook" and the School District's

-15-

"ongoing financial pressures." Finally, the School District would be required to prove that those specific assertions were false. The allegations of the School District's complaint do not permit such strained inferences.

The School District's additional allegation--that the Rating News article implied that it was based on current information--does not remedy the deficiencies of the First Amended Complaint. As Moody's has observed, the School District has not alleged that Moody's evaluation of the factors expressly identified as causing the bonds' "negative outlook" (Amendment I and the underfunding of the School Finance Act) was based on outdated information. Accordingly, the School District's allegation amounts to a contention that Moody's evaluation was based on unspecified, outdated information about unnamed factors causing the bonds' negative outlook. Again, such speculative conclusions cannot be drawn by a reasonable reader from the text of Moody's article.

We emphasize that the phrases "negative outlook" "ongoing financial pressures" are not necessarily too indefinite to imply a false statement of fact. If coupled with specific factual assertions, such statements might not be immunized from defamation claims by the First Amendment. Moreover, the fact that Moody's article describes its evaluation as an opinion is not sufficient, standing alone, to establish that Moody's statements are protected. See Milkovich, 497 U.S. at 19. Moody's sells its opinions much as a title attorney would sell a title opinion. Indeed, in its appellate brief, Moody's refers to "the proven objectivity of [its] opinions, which are issued in accordance with Moody's

-16-

responsibility to investors and subscribers." Aplee's Br. at 22-23 n.18 (emphasis added).

If such an opinion were shown to have materially false components, the issuer should not

be shielded from liability by raising the word "opinion" as a shibboleth. However, in this

case, the School District's failure to identify a specific false statement reasonably implied

from Moody's article, combined with the vagueness of the phrases "negative outlook" and

"ongoing financial pressures" indicates that Moody's article constitutes a protected

expression of opinion.[3]

We therefore conclude that the district court properly dismissed the School District

claim for publication of an injurious falsehood for failure to state a claim.

### C. Claims for Intentional Interference with Contractual and Business Relations

---

[3] Assessing other possible causes of action against bond rating agencies like Moody's, one commentator has concluded that the tort of negligent misrepresentation should not be extended to them:

> Courts cannot constitutionally allow recovery on any showing less than recklessness because of the potential chilling effect that imposing a negligence standard would have on rating publications. Given the importance of financial information to investors and the economy as a whole, bond rating constitutes a matter of "public concern." Applying traditional first amendment law, the state's interest in compensating relying investors must give way to the first amendment's concern for the free flow of commercial information. Society must rely on the market and competition to keep rating agencies operating at their negligence threshold, not on courts and juries.

Husisian, supra, at 460.

-17-

The District also argues that, even if Moody's article constitutes an opinion protected by the First Amendment, the district court still erred in dismissing the state law claims for intentional interference with contract and for intentional interference with prospective business relations. According to the School District, these claims are directed at Moody's conduct rather than at its speech. Arguing that numerous courts have rejected First Amendment challenges to laws that regulate conduct and have merely incidental effects on protected speech, see e.g., Cohen v. Cowles Media, Co., 501 U.S. 663, 669 (1991), the School District maintains that its intentional interference claims should be allowed to proceed to trial. Because the School District argument raises legal questions, we review the district court's decision de novo. City of Wichita v. United States Gypsum Co., 72 F.3d 1491, 1495 (10th Cir.1996).

The School District's argument is undermined by the Supreme Court's decision in Hustler Magazine v. Falwell, 485 U.S. 46 (1988). In that case, a public figure asserted claims for libel and for intentional infliction of emotional distress against a magazine that had published an offensive parody. The jury returned a verdict for the defendant magazine on the libel claim, finding that the parody could not be reasonably read as describing actual facts about the plaintiff. However, the jury found for the plaintiff on the emotional distress claim, awarding actual and punitive damages.

The Supreme Court concluded that, in light of the jury's rejection of the libel claim, the emotional distress claim was barred by the First Amendment. It held that "public

figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with 'actual malice,' i.e. with knowledge that the statement was false or with reckless disregard as to whether or not it was true." Hustler Magazine, 485 U.S. at 56. In supporting this conclusion, the Court noted the chilling effect on protected speech that might ensue if damages could be recovered on emotional distress claims for publications that were not provably false. See id. at 53-55.

Lower federal courts have applied a similar approach, rejecting a variety of tort claims based on speech protected by the First Amendment. For example, in Unelko , 912 F.2d at 1057-58 (9th Cir. 1990), the Ninth Circuit held that state law claims for trade libel and tortious interference with business relationships were subject to the same First Amendment requirements as claims for defamation. Because the plaintiff had failed to rebut the defendant's evidence that the challenged publication contained no false statements of fact, the court concluded that summary judgment was proper on the non-defamation tort claims as well. Id. at 1058. Similarly, in Henderson v. Times Mirror Co., 669 F. Supp. 356, 362 (D. Colo 1987), aff'd, 876 F.2d 108 (10th Cir. 1989), the court dismissed claims for disparagement and intentional interference with contract because they were based on an expression of opinion protected by the First Amendment. See also South Dakota v. Kansas City Southern Industries, 880 F.2d 40, 50-54 (8th Cir. 1989) (concluding

-19-

that the plaintiff could not bring a claim for tortious interference with contract because the claim was based on the defendant's filing of a lawsuit, an activity protected by the First Amendment); Eddy's Toyota of Wichita, Inc. v. Kmart Corp., 945 F. Supp. 220, 224 (D. Kan. 1996) (concluding that letters that constituted expressions of opinion protected by the First Amendment could not form the basis for plaintiff's tortious interference with contact claim.).

The School District attempts to distinguish Hustler Magazine and these lower court decisions by arguing that its allegations against Moody's are directed at conduct rather than speech. It maintains that the publication of the article in Rating News was part of a pattern of conduct in which Moody's issued such ratings in order to retaliate against bond issuers who chose not to hire Moody's to rate their bonds. Thus, according to the School District, Moody's "conduct" amounts to a series of decisions to publish negative ratings at particular times.

Tellingly, the School District cites no authority in support of the proposition that a decision to engage in protected speech at a particular time constitutes conduct that may be regulated by means of state tort actions for interference with contract or business relations. In our view, the School District's contention is inconsistent with applicable First Amendment principles. In particular, as noted in Hustler Magazine, the Supreme Court has concluded that "even when a speaker is motivated by hatred or illwill his expression [is] protected by the First Amendment." Hustler Magazine, 485 U.S. at 53 (citing Garrison

-20-

v. Lousianna, 379 U.S. 64, 73 (1964). To allow a plaintiff to establish a tort claim by proving merely that a particular motive accompanied protected speech, the Court reasoned, might well inhibit the robust debate that the First Amendment seeks to protect. See id. at 51-53. Yet, under the School District's reading of state tort law governing its claims for interference with contractual and business relations, the protection afforded to an expression of opinion under the First Amendment might well depend on a trier of fact's determination of whether the individual who had published the article was motivated by a legitimate desire to express his or her view or by a desire to interfere with a contract.

Moreover, the School District's argument finds little support in Colorado law. In Colorado, a plaintiff asserting claims for intentional interference with contract and intentional interference with prospective business relations must establish that the interference was intentional and "improper." See Amoco Oil Co. v. Ervin, 908 P.2d 493, 500 (Colo. 1995) (en banc); Westfield Dev. Co. v. Rifle Investment Assoc., 786 P.2d 1112, 1117 (Colo. 1990). Whether the interference is "improper" depends on the following factors: " (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties." Amoco Oil Co., 908 P.2d at 500 (quoting Restatement (Second) of Torts § 767 (1979)).

Although the actor's motive is listed as one relevant factor, the decisions of Colorado courts do not support the School District's contention that Moody's allegedly retaliatory motive may itself render the publication of a constitutionally protected opinion an improper interference with a contract or with prospective business relations. Contrary to the School District's suggestion, in instances in which a plaintiff's tortious interference claims are based on lawful conduct or speech, the courts have concluded that such lawful activity is insufficient to establish the required element of improper conduct.

For example, in Martin v. Montezuma-Cortez School District RE-1, 841 P.2d 237, 251 (Colo. 1992) (en banc), the court affirmed the grant of summary judgment on a tortious inference with contract claim based on an allegedly illegal strike. The court reasoned that because the strike was legal under the state industrial relations statutes, the plaintiff could not prevail on the tort claim. Similarly, in Amoco Oil, in reversing a jury verdict on a claim for intentional interference with prospective business relations, the court observed that "'an actor may use persuasion . . .' without engaging in wrongful means." Amoco, 908 P.2d at 502 (quoting Restatement of Torts (Second) § 768 cmt. e (1979)).

We acknowledge that neither Martin nor Amoco involves precisely the kinds of claims at issue here–allegations of tortious interference based on a statement of opinion protected by the First Amendment. Nevertheless, the fact that neither lawful strikes nor the persuasive efforts of a business competitor constitutes improper interference suggests that the expression of an opinion protected by the First Amendment is similarly

-22-

insufficient.

Accordingly, we conclude that the district court properly entered judgment in favor of Moody's on the School District's claims for intentional interference with contract and with prospective business relations.

### D. Antitrust Claims

Finally, the School District argues that the district court erred in denying its motion for leave to file a Second Amended Complaint adding claims for monopolization and attempted monopolization in violation of section 2 of the Sherman Act, 15 U. S. C. § 2. We review the denial of a motion for leave to amend for abuse of discretion. Bauchman v. West High School, 132 F.3d 542, 559 (10th Cir. 1997), cert. denied, 118 S. Ct. 2370 (1998). Although Fed. R. Civ. P. 15(a) provides that leave to amend shall be given freely, the district court may deny leave to amend where amendment would be futile. Id. at 561. A proposed amendment is futile if the complaint, as amended, would be subject to dismissal. See TV Communications Network, Inc., v. Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992). Accordingly, in determining whether the district court abused its discretion in denying the School District's motion for leave to amend, we consider the sufficiency of the antitrust claims that it sought to add in its Second Amended Complaint.

In support of its antitrust claims, the School District argues that, just as with its

claims for intentional interference under Colorado law, its allegations are directed against Moody's conduct and not merely at its speech. The School District notes that "'it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either written, spoken, or printed.'" Aplt's Br. at 12 (quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949)). Invoking the Supreme Court's observation that "words can in some circumstances violate laws directed not against speech but against conduct," R.A.V. v. City of St. Paul, Minnesota, 505 U.S. 377, 389 (1992)), for example when the telling of defense secrets violates laws against treason, id., the School District maintains that Moody's negative bond rating was part of a course of conduct that violated the antitrust laws. Thus, the School District maintains, even if the bond rating constitutes a constitutionally protected statement of opinion, Moody's may still be held liable for violating the Sherman Act.

The School District cites a series of decisions in which the defendant held liable on an antitrust claim engaged in speech related to its anticompetitive scheme. See, e.g., Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 430-32 (1990) (upholding finding that an attorneys' association's boycott of assignments to cases involving indigent defendants violated the antitrust laws even though the boycott had an expressive component); National Society of Professional Engineers v. United States, 435 U.S. 679 (1978) (upholding finding that a professional association's ban on competitive

bidding for engineering services violated the antitrust laws even though one means of carrying out the ban was through the publication of an ethical code); American Society of Mechanical Eng'rs v. Hydrolevel Corp., 456 U.S. 556 (1982) (upholding finding that professional association violated the antitrust laws through the issuance of an inaccurate safety report used to undermine a competitor's product); Wilk v. American Medical Ass'n, 895 F.2d 352, 357-58, 371 (7th Cir. 1990) (upholding finding that a medical association's boycott of chiropractors violated the antitrust laws even though one means of enforcing the boycott was through the association's code of ethics). More generally, the School District relies on decisions holding that the First Amendment does not provide publishers with immunity from antitrust laws. See Citizen Publishing Co v. United States, 394 U.S. 131, 135 (1969) (upholding injunction prohibiting newspaper publishers from engaging in joint operating agreement); Lorain Journal Co. v. United States 342 U.S. 143 (1951) (finding a violation of the antitrust laws when newspaper publisher's refusal to publish advertisements from businesses that also placed advertisements with competing radio station).

National Society of Professional Engineers exemplifies the School District's authorities. There, the Supreme Court upheld a district court's determination that a professional association had violated the Sherman Act by publishing an ethical code that prohibited engineers from engaging in competitive bidding. The Court rejected the association's First Amendment challenge to an injunction barring the adoption of an

opinion stating or implying that competitive bidding for engineering services was unethical. In light of Sherman Act violation, the Supreme Court said, the district court was empowered to fashion appropriate remedies. National Society of Professional Engineers, 435 U.S. at 697. The School District analogizes the professional association's ethical code to Moody's assessment of the refunding bonds, reasoning that because both the code and the assessment of the bonds served as means of accomplishing antitrust violations, both may serve as the basis for liability under the Sherman Act.

Like the district court, we are not convinced by the School District's reading of these antitrust decisions. In National Society of Professional Engineers it was not the professional association's code of ethics that itself constituted the unlawful restraint of trade. Rather, it was the effect of the publication of the code–that engineers following the code refused to engage in competitive bidding–that established the antitrust violation. See id. at 692 (noting that "[i]n this case, we are presented with an agreement among competitors to refuse to discuss prices with potential customers until after negotiations have resulted in the initial selection of an engineer"). In the other cases on which the School District relies, the defendant engaged in a course of conduct found to constitute a restraint of trade. Although certain forms of speech were used to further the scheme, the speech itself was not the sole means of restraining trade. Thus, these decisions do not suggest that merely engaging in protected speech may constitute an antitrust violation. For example, there is no indication in the Supreme Court's decision in National Society of

Professional Engineers that the professional association could be held liable for antitrust violations if it had simply expressed its opinion about competitive bidding rather than influencing the conduct of engineers marketing their services.

In contrast, in this case, the School District's contention is that the publication of Moody's article itself constituted a violation of the antitrust laws. As with its state law tort claims, its contention is that because the ratings were issued with a certain intent (the intent to exercise monopoly power), Moody's may be held liable. In our view, the First Amendment does not allow antitrust claims to be predicated solely on protected speech.

Accordingly, we conclude that the district court did not abuse its discretion in denying the School District's motion to file a Second Amended Complaint.

CONCLUSION

Because the School District's complaint fails to allege that Moody's article contained or implied a provably false factual assertion, we conclude that the article is protected by the First Amendment. Accordingly, the district court properly dismissed the School District's claim for publication of an injurious falsehood. Additionally, because the School District's claims for intentional interference with contract and with prospective business relations are based on Moody's article, the district court properly dismissed those claims. Finally, because the antitrust claims that the School District sought to add in its

Second Amended Complaint are also based on Moody's article, the district court properly concluded that allowing the School District leave to amend would be futile.

Accordingly, the judgment of the district court in favor of Moody's and against the School District is AFFIRMED.